## Paul BRYANT *v.* V. J. BRADY

5-4455                                          427 S. W. 2d 179

### Opinion delivered May 6, 1968

*Thompson & Thompson,* for appellant.

*Jones & Stratton,* for appellee.

Conley Byrd, Justice. This litigation arises over a contract whereby appellant Paul Bryant employed appellee V. J. Brady to do certain clearing. Brady initiated suit claiming that after credit for payment of $1,000 he was entitled to a balance of $1,933.50. Bryant denied that Brady had performed his contract and filed a cross action claiming damages, among other things, for loss of rental, for loss on sales of cows, and for pain and mental anguish, all in the amount of $6,050. From a jury verdict awarding Brady a judgment of $1,500, appellant appeals, contending that he was not permitted sufficient time to

make discovery; that the verdict was excessive and not warranted by the facts; and that the "jurors did not truthfully answer questions proposed to them by the judge as to their knowledge and acquaintance with the plaintiff as they were qualified." Since we reverse the case upon the third point, we do not reach the first two.

The record on the third point shows that juror Estel York had known Brady all of his life and that during the time of the lawsuit Brady was purchasing gasoline from him. He did not recall Judge Roberts[1] asking the jurors, "Do you, or any of you, know the plaintiff or the defendant?"

Juror T. F. Bryant (not related to appellant) had known Mr. Brady all of his life. During 1960 and 1961 he and Brady had together bought a cotton stripper and used it in their farming operations. When first asked if he recalled Judge Roberts' asking him, "Do you know the plaintiff or defendant?" juror Bryant answered, "No sir, that question was not asked." Subsequently juror Bryant testified that he did remember Judge Roberts excusing one or two jurors. Thereafter the following occurred:

"Q Do you know what questions were asked of them?

A Well, not particularly I don't. Seems like one of them had business with him the last year or two or something, maybe currently doing business with him.

Q What prompted that answer—that response, Mr. Bryant, by that prospective juror?

A I don't know. Maybe he was asked, I don't

---

[1]Although Judge Roberts qualified the jury, he disqualified himself, and Hon. Rolland Bradley was elected to serve as special judge in his stead.

know. Maybe he was currently doing business with him.

Q Well, are you saying that these jurors may have been asked some question that prompted that response, or you don't know, or didn't hear, or what is your recollection of that?

A Well, I believe the question was asked, 'Have you done business with Mr. Brady, or currently doing business with him, in the last year or so?'

Q You did hear that question, 'Have you done business with Mr. Brady in the last year or so?'

A Yeah.

Q You heard that question?

A Yeah.

Q And did you see anyone that made a response to it?

A Well, there was some left the room; I suppose that was the cause of it.''

Juror J. M. Cartwright testified that he had known Mr. Brady for a long time and that he did not respond when Judge Roberts asked if any of them knew the plaintiff or the defendant.

Juror Ellis Lasley testified that he had known Brady all of his life, that he had operated a gin from 1920 to 1963 and that Brady had ginned cotton with him. He recalled Judge Roberts' asking some questions and people raising their hands and indicating an answer or response to those questions. He remembered that a

Mr. Hiegel had made a statement and that Judge Roberts had excused Mr. Hiegel. When specifically asked, "Do you remember Judge Roberts asking the jury panel, '. . . Do any of you know the plaintiff or defendant?' " juror Lasley answered, "I don't know whether he said that or not."

The record on the motion for a new trial obviously shows that Judge Roberts, in qualifying the jury, asked if any of the jurors knew Brady or Bryant and if any of the jurors were doing business with either Brady or Bryant. The record also establishes that these four jurors remained silent to the questions of the judge, although other prospective jurors raised their hands or otherwise responded to the judge's questions.

In *Missouri Pac. Transportation Co.* v. *Johnson,* 197 Ark. 1129, 126 S. W. 2d 931 (1939), we recognized that the silence of a juror in a situation such as this amounts to an answer. Certainly here, where other jurors understood the questions and responded, we must accept the jurors' silence as a responsive answer to the court's questions.

In *D. F. Jones Construction Co.* v. *Fooks,* 199 Ark. 861, 136 S. W. 2d 487 (1940), two of the jurors were qualified by the trial court on the basis that they had not formed any opinion about the lawsuit and "that they had not been talked to by anyone relative to the case." On motion for a new trial it was shown that one Clyde Robins, prior to the trial, had offered the two jurors a bribe to return a verdict for Fooks. In holding that the trial court abused its discretion in failing to set aside the verdict, we said:

"The jury system is a great institution and should hold itself aloof from any and all corrupt influences. Members of juries owe it to themselves and to the great system to preserve the integrity of their verdicts. If there is substantial evidence in the case to

support the verdict of the jury this court will not try a case *de novo,* but will accept and receive the verdict of the jury as final on issues involving not only property rights, but issues involving life and death. The only way to preserve the integrity of the verdicts of juries and keep the stream of justice pure is to set aside verdicts returned by juries which have been tampered with or attempted to be tampered with."

Here we think the trial court abused its discretion by not setting aside the verdict. Obviously, the jurors did not fairly answer the questions put to them by the court. Of course, truthful answers to the questions would not necessarily have disqualified the jurors, but how can we assert that they returned a fair verdict when they did not give fair answers to questions of the court? When viewed from the standpoint that "justice ought not only to be fair but appear to be fair," *Arkansas State Hwy. Comm'n* v. *Young,* 241 Ark. 765, 410 S. W. 2d 120 (1967), we think the trial court under the record here abused its discretion in not setting aside the verdict.

Appellee argues that the motion for new trial can not be considered because it was not verified as required by Ark. Stat. Ann. § 27-1905 (Repl. 1962), which provides:

"*Form of application.*—The application must be made by motion, in writing, setting forth in separate paragraphs the grounds or assignments of error relied upon for reversal of the verdict or decision. The grounds mentioned in the second, third and seventh subdivisions of section 1536 [§ 27-1901] must be sustained by affidavits or other competent testimony, showing their truth, and may be controverted in the same manner. [Civil Code § 374; C. & M. Dig., § 1315; Pope's Dig., § 1540; Acts 1939, No. 167, § 1, p. 402.]"

We do not agree with appellee's interpretation of the statute. As amended by Act 167 of 1939, the statute requires only that the grounds mentioned in the second, third and seventh subdivisions of Ark. Stat. Ann. § 27-1901 (Repl. 1962) must be sustained by "affidavits or other competent testimony, showing their truth." In this case appellant sustained his grounds by the sworn testimony of the jurors in open court. Furthermore, the motion for new trial may be considered as having been brought under the first section of § 27-1901, which is not affected by § 27-1905.

Reversed and remanded.

JONES, J., dissents.

J. FRED JONES, Justice, dissenting. I do not agree with the majority opinion in this case and I would affirm the judgment on all three points.

Appellant's motion for a new trial and his third point based thereon carry implications not sustained by the record in this case. Appellant alleged in his motion for a new trial "that two of the jurors, when asked the question, 'Do you know or have any business with either party of this law suit?' remained silent; that one of said jurors lives approximately one mile from the plaintiff, and one of the other jurors operates a grocery store and was doing business with the plaintiff immediately prior to the date of trial." The *record* does not reveal that such question was even asked.

The record is completely silent as to the form and substance of any of the questions propounded to the jurors by the trial court judge in qualifying the jury on voir dire, and the record does not reveal that appellant's attorney asked any questions at all, or attempted to do so, until some two months after the case was tried when four of the jurors were questioned at the hearing on appellant's motion for a new trial.

The only record pertaining to the questions propounded, and the answers given, in qualifying the jury on voir dire, lies wholly within the allegations in appellant's motion for a new trial, and within the memory of the four jurors who testified at the hearing on the motion for a new trial, none of whom were sure what questions were propounded to them by the trial judge.

In the case at bar it is not contended that the jurors answered falsely concerning their qualifications when questioned by the trial court on voir dire, the allegation is, that they remained silent when the questions were propounded to them. I recognize that silence in this connection amounts to an answer, but, even assuming that the questions were asked and had been answered in the affirmative, knowing the parties to a lawsuit or having done business with them obviously does not disqualify a juror. If the appellant desired information on this point to assist him in the exercise of his peremptory challenges, he had a perfect right to call any failure to answer to the attention of the trial court, and he had a statutory right to propound further questions (within the discretion of the trial court) to the prospective jurors concerning their qualifications. Ark. Stat. Ann. § 39-226 (Repl. 1962).

In *Jones Construction Co.* v. *Fooks,* 199 Ark. 861, 136 S. W. 2d 487, cited by the majority, the jurors had been promised, as a bribe, 2% of the amount of any verdict they would return in favor of the plaintiff. They did return a verdict for the plaintiff but they had failed to reveal the offer of the bribes in answer to questions propounded to them on voir dire. The record is clear in the case at bar that Brady was well known in Faulkner County as well as in Prairie and Lonoke Counties. The failure of jurors to reveal that they were acquainted with him, as alleged in the case at bar, is not even close to the failure to reveal an offer of a bribe as testified to, and admitted, by both the offeror and the jurors in the *Fooks* case. The only prejudice appellant could have

claimed, in the case at bar, by the jurors' failure to answer the questions he says were propounded to them, would have been in exercise of his three peremptory challenges in the selection of a drawn and struck jury.

At the hearing on appellant's motion for a new trial, the trial court heard the testimony of four jurors, York, Bryant, Cartwright and Lasley. York testified as follows on the point in issue:

"Q. Do you know Mr. Brady?

A. Sure, everybody knows him.

Q. Do you recall Judge Roberts asking the jurors before they were chosen, 'Do you, or any of you, know the plaintiff or defendant'?

A. No, sir.

Q. You don't recall that question being asked?

A. No, sir, I sure don't."

On this point Bryant testified as follows:

"Q. Do you recall the questions that Judge Russell Roberts asked you as you were sitting on the other side of the courtroom, before you went on to the jury?

A. I pretty well recall them.

Q. Do you recall him asking you a question, 'Do you know the plaintiff or defendant?'

A. No, sir, that question was not asked.

Q. That question was not asked?

A. It sure wasn't.

\* \* \*

Q. Do you know Mr. V. J. Brady?

A. All my life.

Q. And how far do you live from him?

A. Well, it's about two mile.

Q. What is your acquaintance with him, Mr. Bryant?

A. Well, I just know him, I know everybody that lives around here.

\* \* \*

Q. Have you ever done any business, bought cattle or had work done by Mr. Brady?

A. Not in the past several years.

Q. Well, what business had you had with Mr. Brady at any time?

A. Well, about '60 or '61 we bought a cotton stripper, and I run it and stripped our cotton that fall.''

On redirect examination Mr. Bryant testified as follows:

''Q. Mr. Bryant, do you recall a man who was working for the bank here in Conway raising his hand and making some statement when you were inquired of by Judge Roberts?

A. No, I don't.

Q. Do you remember Judge Roberts excusing any jurors; telling them they would be excused from the panel that day?

A.  Yeah, I remember one or two being excused.

Q.  Do you remember who those were by name?

A.  No, I don't.

Q.  Just remember some people? Do you know why they were excused?

A.  No, I don't.

Q.  Do you know what questions were asked of them?

A.  Well, not particularly I don't. Seems like one of them had business with him the last year or two or something, maybe currently doing business with him.

Q.  What prompted that answer—that response, Mr. Bryant, by that prospective juror?

A.  I don't know. Maybe he was asked, I don't know. Maybe he was currently doing business with him.

Q.  Well, are you saying that these jurors may have been asked some question that prompted that response, or you don't know, or didn't hear, or what is your recollection of that?

A.  Well, I believe the question was asked, 'Have you done business with Mr. Brady, or currently doing business with him, in the last year or so?'

Q.  You did hear that question, 'Have you done business with Mr. Brady in the last year or so?'

A. Yeah.

Q. You heard that question?

A. Yeah.

Q. And did you see anyone that made a response to it?

A. Well, there was some left the room; I suppose that was the cause of it.

Q. Do you know whether or not Mr. York responded to that question?

A. I don't know.

On this same point Cartwright testified as follows:

"Q. Do you know Mr. Brady?

A. Yes, sir.

Q. How long have you known Mr. Brady?

A. Oh, a long time.

Q. What relationship have you had with Mr. Brady, either business or social?

A. None.

\* \* \*

Q. Do you recall the day of this trial?

A. Yeah.

\* \* \*

Q. Do you recall Judge Roberts asking questions of the jury panel; the entire panel at the time the jury was seated at the Judge's right?

A. Well, I don't remember.

Q. Do you recall that he asked some questions?

A. Yeah.

Q. Do you recall any of those questions?

A. (Shakes head negatively)

Q. Do you recall whether or not you made a response to any of those questions?

A. I didn't.

Q. You did not?

A. (Shakes head negatively)

Q. Do you remember whether or not Judge Roberts asked if any person—if any member of the jury had done any business with Mr. Brady?

A. He might have.

Q. Do you remember if any person made a response to that question?

A. (Shakes head negatively)

Q. You don't remember whether anyone did or not?

A. (Shakes head negatively)

Q. Do you know whether or not—do you remember whether or not Judge Roberts asked the question, 'Do any of you know the plaintiff or defendant?'

A. Yeah.

Q. Did he ask that question?

A. I think so.

Q. Did you make any response to that question?

A. No.

Q. You did not?

A. (Shakes head negatively)

Q. How long have you known Mr. Brady?

A. Oh, several years.

      \*    \*    \*

A. I've been acquainted with him for a long time, as far as knowing him, and as far as talking with him, I've talked with him very little.

Q. All right. How recently immediately preceding the trial had you had discussions with Mr. Brady?

A. I don't remember of any."

Mr. Ellis Lasley testified as follows:

"Q. How long have you known Mr. Brady?

A. All his life.

      \*    \*    \*

Q. Do you recall some questions being asked and people raising their hand, or indicating an answer or response to those questions?

A. Yes, I think so.

Q. Do you recall a comment or a statement by a man who was an employee of the Conway Bank?

A. I remember Mr. Hiegel *making a statement.*

Q. Do you remember what his statement was?

A. Nothing more than they were both customers of his, and as I understand that's what he said.

Q. Do you remember what prompted him to make that response? Did Judge Roberts ask him a question, or ask the jury panel a question?

A. *Really, I don't know whether he did, or whether he just asked if he could get off because he was*—I'm not sure on that question.

Q. Do you recall Judge Roberts asking any questions to the panel as they sat over there?

A. Well, I remember him saying the reason he would be excused.

Q. The reason Judge Roberts was being excused?

A. Yes, from choice; that he was related to him.

Q. Do you remember Judge Roberts asking the jury panel, 'Do you know the plaintiff or defendant? Do any of you know the plaintiff or defendant?'

A. I don't know whether he said that or not.

Q. Would you say it again, please, sir?

A. I say I don't know whether he said that or not. I don't remember.

Q. Do you remember whether he asked the question, 'Do you, or any of you, have any busi-

ness transactions recently with the plaintiff or defendant?'

A. I don't remember; I sure don't.

\* \* \*

Q. You do not recall Judge Roberts asking if you knew or were acquainted with either party?

A. No, I sure don't." (Emphasis supplied).

The record is silent as to *why* Judge Roberts disqualified himself, but the record does reveal Judge Roberts' statement to the jury in disqualifying himself, and the record does not sustain Mr. Lasley's version if Lasley was, in fact, referring to Judge Roberts disqualifying himself because of relationship to the appellee. According to the record before us, Judge Roberts' statement to the jury in disqualifying himself was as follows:

"Ladies and Gentlemen of the jury, due to circumstances beyond my control and under the laws of our State, it is necessary I disqualify this morning, and Judge Bradley has been elected by the Bar of the City of Conway, Arkansas, Faulkner County, to take my place."

In the case of *Fones Brothers Hdw. Co.* v. *Mears*, 182 Ark. 533, 32 S. W. 2d 313, the trial court in qualifying the regular panel of jurors on their voir dire, inquired of all members of the panel if they were related by blood or marriage to either of the parties to the lawsuit by consanguinity or affinity, to which all except one, replied in the negative. After the verdict, it was learned that one of the accepted jurors was a first cousin to the defendant. Upon appeal from an order of the trial court overruling a motion in arrest of judgment and for a new trial, this court said:

"We have stated the rule on this subject to be that 'when objection is made to a juror after the ver-

dict for the first time, due diligence must be shown by the objecting party,' and that it then 'becomes to some extent a matter of discretion with the trial court as to whether or not the verdict shall be set aside; and when there is no fraud intended or wrong done or collusion on the part of the successful party, it is not reversible error for the trial court to refuse to set aside the verdict.''

In the *Mears* case, as in the case at bar, the record did not show what questions were asked. The motion was supported by affidavits in that case, however, and it was brought here on certiorari. In sustaining the trial court in the *Mears* case, we said:

''The majority is of the opinion that in the state of the record there was no such showing of due diligence made by the objecting party (the objection being made to the juror after the return of the verdict for the first time) as would require the granting of the motion to refuse to enter judgment on the verdict and refusing to grant the motion for a new trial on the ground of the alleged relationship of the juror to appellee. As heretofore held, it is a matter of discretion of the trial court as to whether the verdict should be set aside when objection is made to a juror after the verdict for the first time, and the majority of the court from the state of the record is not able to say that the court abused its discretion in overruling the motion and refusing to grant a new trial because of the alleged relationship.''

The juror in the *Mears* case was *legally disqualified,* but in that case, as in the case at bar, the record did not show diligence on the part of appellant. See *Mo. Pac. RR. Co.* v. *Bushey,* 180 Ark. 19, 20 S. W. 2d 614; *James* v. *State,* 68 Ark. 464, 60 S. W. 29.

It may be that appellant now feels he could have

done a better job in the exercise of his peremptory challenges, but I am unwilling to accept the allegations in any motion for a new trial as recorded evidence supporting the allegations in the motion, and I am unwilling to put Faulkner County and the parties to this lawsuit to the additional expense of a new trial because of alleged failure of jurors to answer questions they do not recall having been asked; questions that neither the record nor the proof reveal were asked, and questions that if asked and answered in the affirmative, would not have disqualified the jurors anyway.

By the exercise of due diligence, appellant could have learned all he had a right to know about the jurors at their examination on voir dire. Appellant has failed to show due diligence in support of his motion for a new trial and I would affirm the trial court in denying the motion.