Robert Andrew BAYSINGER v. STATE of Arkansas

CR 76-229                                    550 S.W. 2d 445

Opinion delivered May 16, 1977
(Division II)

*Gail O. Matthews, Roy Gene Sanders,* and *Adams & Covington,* for appellant.

*Bill Clinton,* Atty. Gen., by: *Joseph H. Purvis,* Asst. Atty. Gen., for appellee.

CONLEY BYRD, Justice. This appeal comes from a judgment entered on a jury verdict finding appellant Robert Andrew Baysinger guilty of capital murder and fixing his punishment at life imprisonment without parole.

The record shows that Billy Joe Holder, the decedent, had been sheriff of Searcy County for a number of years. Loren Reeves ran against Holder for sheriff in 1972 but Holder won. Loren Reeves ran again in 1974 for sheriff and this time defeated Holder. Thereafter, Holder, over the objections of Reeves, was employed by the State as an enforcement agent with the Alcohol Beverage Control Board. Shortly before his death, Holder in his capacity as a law enforcement officer with the Alcohol Beverage Control Board had caused

appellant and appellant's wife to be arrested for bootlegging. Appellant at the time told Reeves that appellant was going to kill Holder. Some week or two later appellant told Reeves that if Reeves would put $2000 in the pot, appellant would try to take care of everything. Following Holder's assassination on February 9, 1976, appellant told Reeves ". . . me, you, and the man that done it, and another woman are the only ones that can involve me. . . ." Reeves then quoted appellant as saying "you better damn sure keep your mouth shut." In June appellant met Reeves on the parking lot of the Sunset Motel where Reeves taped the conversation he had with appellant. Appellant there identified Norman Sutterfield as the trigger man and explained that he contacted him through the Kiddie Care Nursery in Conway, Arkansas. The State proved that long distance calls had been made from appellant's phone to the Kiddie Care Nursery. The proof showed that appellant had been seen in the vicinity on the day of the murder in a pickup truck matching the description of Sutterfield's truck. Other proof showed that appellant had caused to be withdrawn $17,697.27 from a savings account within a few weeks of the murder. Appellant had hunted other persons who were responsible for his bootlegging arrest for the purpose of whipping them.

POINT I. We can find no merit to appellant's contention that he was entitled to a directed verdict in his favor.

POINT II. Appellant here contends that the trial court erred in allowing into evidence the incriminating tape recorded conversation between him and Reeves. The first contention is that it violated his Fifth and Sixth Amendment rights because he was not given his *Miranda* warnings. We can find no merit to this contention. See *Oregon* v. *Mathiason,* 429 U.S. 492, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977). The proof on the part of the State shows that appellant was neither in custody nor deprived of his freedom while talking with Reeves — in fact, the evidence shows that appellant wanted Reeves for a confederate and at least considered the sheriff a confidant instead of a law enforcement officer.

Neither do we find any merit to appellant's contention that the recorded conversation violated his Fourth Amend-

ment rights. See *Kerr & Pinnell* v. *State,* 256 Ark. 738, 512 S.W. 2d 13 (1974) and *United States* v. *White,* 401 U.S. 745, 91 S. Ct. 1122, 28 L. Ed. 2d 453 (1971).

POINT III. The contention that the trial court, after holding an Omnibus hearing, erred in failing to rule on appellant's motion to suppress prior to trial is not likely to arise upon a new trial.

POINT IV. The fourth contention is that the trial court erred in refusing to permit appellant to show that Reeves had made inconsistent statements.

On February 25, 1976, after interviewing Reeves, Officer Partlow made the following report, to-wit:

"On the morning of 2/25/76, at 11:45 a.m. in Room 28 of the Marshall Motel in the presence of Sgt. Duvall, Sgt. Young and Trooper Partlow, Loren Reeves was offered the opportunity to take a polygraph test and he had previously stated that he would take the test.

When he was told that Sgt. Young was ready to give him the test he became somewhat upset and refused to take the test. He went on to state that he had discussed this with the County Attorney, John Driver, and Driver told him to tell us we could take that box and shove it up our ass. He went on and said that he had nothing to hide but thought the reason for asking him to take the test was politically motivated by Will Goggin, Venson Jones, and Phil Womack.

He further stated that he was a good friend of Robert Baysinger's, he did hunting with Baysinger and considered him a pretty good fellow and didn't believe he would kill anyone."

At the June trial, Reeves testified that Baysinger had planned to kill Holder and that after the murder Baysinger told him "me, you, and the man that done it, and another woman are the only ones that can involve me, and you better damn sure keep your mouth shut." The appellant attempted

to have Reeves' February statement put into evidence at the trial in order to impeach Reeves' credibility. But when the State's objection to it was sustained, the appellant made a proffer of the investigative report for the record.

Apparently, the State's objection to the February statement was based on Ark. Stat. Ann. § 28-708 (Repl. 1962) which required that, before an inconsistent statement can be entered, the witness must be inquired of concerning the same, together with the circumstances of time and persons present. That statute was specifically repealed by Acts 1975 (Extended Sess., 1976), No. 1143, Art. XI § 2. The procedure for examining witnesses with respect to prior inconsistent statements is now controlled by the Uniform Rules of Evidence, Rule 613 (Acts 1975, No. 1143).

The State, to sustain the action of the trial court, now takes the position that the contradictory statements involved collateral matters. However, Reeves' February statement that appellant was a good fellow and that Reeves didn't believe appellant would kill anyone is certainly contradictory to Reeves' statements at the trial to the effect that appellant planned and hired Holder's assassin. It follows that we must hold that the trial court erred in excluding the proffered evidence.

POINT V. Appellant's contention that the prosecuting attorney in his closing argument referred to appellant's failure to take the stand is not likely to arise on a retrial. However, from the meager record presented we find no error.

POINT VI. For the appellant's sixth point for reversal, it is alleged that the trial court erred in overruling appellant's motion for a new trial based upon the non-disclosed relationship of a juror to witnesses called by the prosecution. The record shows Bennie Morrison was the second juror to be seated and was subsequently elected foreman of the jury. On motion for new trial, the State stipulated that Bennie Morrison was a first cousin to witness Donnie Griggs and a third cousin to Jim Morrison who were subpoenaed as witnesses for the State. Jim Morrison was married to the daughter of the decedent.

The record shows that at the Omnibus hearing it was agreed between the Court, the Prosecuting Attorney and Defense Counsel that all jurors related to witnesses within the degree of second cousin would be routinely dismissed for cause. When each new panel of jurors was brought into the courtroom, both the prosecution and the defense read their list of prospective witnesses to the panel. Witness Donnie Griggs was listed as a witness for both the prosecution and the defense. The court instructed the jurors to raise their hand if they were related in any way to any of the witnesses. If a juror raised his hand, he was then questioned as to the degree of the relationship. The record reflects that a number of jurors raised their hands and were excused for being within the designated relationship. However, juror Bennie Morrison did not respond to the inquiries.

To counteract the showing made by appellant in support of their motion for new trial, the State introduced the following affidavit:

"STATE OF ARKANSAS
County of Marion

Comes the State of Arkansas, by Kenneth R. Smith, Prosecuting Attorney, and having been duly sworn states on oath:

That on the 30th day of August, 1976, in the presence of Donald Joe Adams, Gail Mathews, and Roy Gene Sanders, Attorneys for the defendant, Robert Baysinger, and in the presence of the Court, after six jurors had been selected, Bennie Morrison being one of said jurors, I moved the Court to excuse Bennie Morrison as a juror for cause to which the defense objected. I then moved the Court to permit me to exercise a preempt toward challenge and excuse Bennie Morrison to which the defense objected pointing out to the Court that the State and the defense had previously agreed at the Omnibus hearing held in this matter that in accordance with case law the State would not be permitted to excuse a juror once accepted except for cause.

That the defense attorneys were at that time advised that the State had received information after Bennie Morrison had been selected that Bennie Morrison was a good friend and customer of Robert Baysinger having purchased whiskey from Robert Baysinger and that Bennie Morrison might have information that the State would want to produce at the trial.

The defense stated that they objected unless State could prove such. A hearing was set for 8:45 Tuesday morning, August 31, in the chambers of the Circuit Court for the State to offer such proof. During the night of August 30th I, accompanied by Jack D. Knox, special agent of the FBI, interviewed witnesses in an attempt to substantiate same but were unable to do so. On August 31st at 8:45 in chambers, I advised the Court and the defense that I could not substantiate same but only have hearsay evidence concerning it, to which the defense renewed their objection to Bennie Morrison being excused either peremptorily or for cause.

Kenneth R. Smith, Prosecuting Attorney"

Based upon the showing made the trial court overruled appellant's motion for new trial.

In *Bryant* v. *Brady,* 244 Ark. 807, 427 S.W. 2d 179 (1968), we had before us jurors who had remained silent when they were asked to respond to questions as a group by raising their hands. After pointing out that the silence of a juror in such a situation amounts to a response to a question, we then stated:

"Here we think the trial court abused its discretion by not setting aside the verdict. Obviously, the jurors did not fairly answer the questions put to them by the court. Of course, truthful answers to the questions would not necessarily have disqualified the jurors, but how can we assert that they returned a fair verdict when they did not give fair answers to questions of the court? When viewed from the standpoint that 'justice ought not only to be fair but appear to be fair,' *Arkansas State Hwy.*

*Comm'n* v. *Young,* 241 Ark. 765, 410 S.W. 2d 120 (1967), we think the trial court under the record here abused its discretion in not setting aside the verdict."

Following our decision in *Bryant* v. *Brady, supra,* the General Assembly recognized the justness of the premise thereof by Acts 1969, No. 568, § 6 [Ark. Stat. Ann. § 39-106 (Supp. 1975)] which provides:

"No verdict or indictment shall be void or voidable because any juror shall fail to possess any of the qualifications required in this Act [§§ 39-101 — 39-108, 39-201 — 39-220] unless a juror shall knowingly answer falsely any question on voir dire relating to his qualifications propounded by the court or counsel in any cause. A juror who shall knowingly fail to respond audibly or otherwise as is required by the circumstances to make his position known to the court or counsel in response to any question propounded by the court or counsel, the answer to which would reveal a disqualification on the part of such juror, shall be deemed to have answered falsely."

In view of the constitutional guarantee (Ark. Const. Art. 2 § 10) of a trial by "an impartial jury," we must hold on the record before us that the trial court erred in overruling appellant's motion for new trial. To avoid these consequences, the State contends that the juror was overly friendly to the appellant. However, this contention is not substantiated by the record. Since the State at the trial recognized that the evidence was not sufficient to sustain a death sentence, we fail to see how a juror who has failed to give fair answers to the qualifying questions put to him and who subsequently votes to bring in the highest possible penalty against the defendant can be said to be overly friendly toward him.

POINT VII. The record shows that the jury was sequestered by court order. Some of the jurors were permitted in the presence of the bailiff to place calls to members of their family for personal supplies such as clean clothes. On the night before the court submitted the case to the jury, the

bailiff at the suggestion of the court arranged for the jurors to have dinner with members of their family. At that dinner the bailiff, of couse, did not hear every conversation. However, under the circumstances it would appear that the State met its burden of showing that no improper influence was brought to bear upon an individual juror — *i.e.* any separation of the jurors that may have occurred cannot be said to have been done without the permission of the court.

POINT VIII. Sergeant Earl Rife and Major Tudor, after listening to the taped recording of the conversation between Reeves and appellant, caused a transcription of the tapes to be made. Where the officers were unable to understand the conversation, a blank was left or a notation made to show that the officers could not understand the tape. Over the objection of appellant that it was the officers' interpretation of the tape and that the officers did not have the original transcript they corrected, the court permitted the transcription to be introduced into evidence and an identical copy was given to each juror to look at while the tape recording itself was being played to the jury. Every witness who was questioned about the transcript stated that the transcription was correct. In fact, appellant did not in the trial court and does not now controvert anything contained in the transcript or assert that it prejudicially misrepresented the conversation on the tape. The assertions now made by appellant are that the trial court erred in allowing the transcript into evidence and in allowing each member of the jury to have and retain a copy of the transcript throughout the trial.

The record does not sustain appellant's assertion that the jurors were permitted to retain a copy throughout the trial. On the other issue the authorities are not in agreement. In *Bonicelli* v. *State,* Okla. Cr., 339 P. 2d 1063 (1959) and *Duggan* v. *State,* Fla. App., 189 S. 2d 890 (1966), it was held error for the State to give the jurors a transcription of a tape recording. In *United States* v. *Turner,* 528 F. 2d 143 (9th Cir. 1975), it was held permissible. We believe that *United States* v. *Turner, supra,* states the better policy where as here the transcription is shown to be accurate and it would be necessary to replay the recording for the jurors several times unless the transcription is used.

For the two errors indicated, the judgment is reversed and the case is remanded for a new trial on the merits.

Reversed and remanded.

We agree: HARRIS, C.J., and FOGLEMAN and HICKMAN, JJ.