Durrell CHILDRESS *v.* STATE of Arkansas

CR 94-1222 907 S.W.2d 718

Supreme Court of Arkansas
Opinion delivered October 16, 1995

128

*William R. Simpson, Jr.*, Public Defender, by: *Llewellyn J. Marczuk*, Deputy Public Defender.

*Winston Bryant*, Att'y Gen., by: *Clint Miller*, Deputy Att'y Gen., Senior Appellate Advocate, for appellee.

ROBERT H. DUDLEY, Justice. Appellant Durrell Childress and Everett Foreman decided to rob Henry Callanen, an off-duty policeman, while he was transporting money to a bank. Foreman, who formerly worked at the McDonald's Restaurant on West Roosevelt in Little Rock, knew that the restaurant closed at midnight on Fridays, knew that it was customary for the restaurant manager to hand Officer Callanen deposit bags containing the day's receipts, knew that the off-duty policeman would then take the bags to his car and drive to the bank. Appellant possessed a pistol.

Just before midnight on a Friday night, appellant and Foreman got in Foreman's car, drove to the area of the restaurant, parked away from the restaurant, got out, skulked close to the restaurant, hid behind a menu board and some shrubs that are located in a drive-through area adjoining the parking lot, and waited for the off-duty officer to take the deposit bags to his car. Three people in a nearby house saw them and sensed what was

about to happen. One phoned the restaurant to give warning. As the phone rang, Anthony Brown, the assistant manager of the restaurant, was handing the deposit bags containing $2,700 to Officer Henry Callanen and setting the alarm system for closing.

Carla Jackson was in a car on the parking lot and saw Officer Callanen come out of the restaurant with the bags and walk toward his car. She saw someone in the drive-through area and heard a shot just as Callanen was approaching his car. She looked up again, saw a person standing close to Officer Callanen, and heard someone say "drop it." She heard two more shots.

Appellant told his friend Tenora Riles that he and Foreman went to the restaurant to commit the robbery and told the officer to "drop the money," but instead the officer fired his pistol. He said that he then started running and threw away his pistol.

Later that night appellant gave his girlfriend Lottie Sims a jacket that had the word "Raiders" emblazoned on it. It was identical to a jacket that witnesses said was worn by one of the robbers. Sims said that appellant told her he wanted money to buy a car and to support his new child.

Appellant gave three additional incriminating statements; the first was non-custodial, and the next two were custodial. In the third of these statements, he admitted all the details of the crime. Appellant and Foreman were jointly charged, but tried separately. In this case, appellant was found guilty of capital murder and aggravated robbery and was sentenced to life imprisonment without parole for the capital murder. We affirm the judgment of conviction.

The evidence of guilt was overwhelming, and appellant does not question the sufficiency of the evidence. Rather, he raises eight points of appeal involving both pre-trial and trial rulings. We categorize the points into five parts.

## I.

Appellant's first point of appeal involves the police transcription of his first in-custodial statement. In *Callaway* v. *State*, 258 Ark. 352, 524 S.W.2d 617 (1975), we said the issue of undue emphasis in transcriptions had never before been pre-

sented to us, but the issue was procedurally barred in that case. Two years later, in *Baysinger* v. *State*, 261 Ark. 605, 550 S.W.2d 445 (1977), we decided the issue. We cited the cases that reflected a division among courts, and held that a police transcription of a recorded statement was admissible (1) when it was shown to be accurate and (2) when it would have been necessary to replay the recording for the jurors several times had the transcription not been used. We did not hold that those two occasions were the only times a police transcription might be admissible. They may be admissible on other occasions, such as when the recording includes inadmissible materials and it would be best to delete the inadmissible materials from a written transcript rather than from the recording. In *Williamson* v. *State*, 263 Ark. 401, 565 S.W.2d 415 (1978), we held that an accused must be supplied a copy of a police transcription of a confession and the original tape so that they could be compared. In *Leavy* v. *State*, 314 Ark. 231, 862 S.W.2d 832 (1993), we held that a trial court had discretion to determine if a transcription was accurate and we would not reverse a finding of accuracy absent an abuse of discretion.

In *Harvey* v. *State*, 292 Ark. 267, 729 S.W.2d 406 (1987), the taped statement was inaudible in part and the police transcription so provided. We upheld its admission because the trial judge gave a cautionary instruction that the police transcription was to be used only as an aid in understanding the recording.

Here, appellant did not object to the use of police transcriptions of the two incriminating statements. Rather, he only objected to the use of certain parts of the transcript of the first statement. His objection was that, in places, the transcript reflects that at the time Officer Callanen came out of the restaurant, appellant said to Foreman, "Now man, now." Appellant contended the transcript should reflect that he said, "Naw man, naw," and he proffered a transcript so stating. He also proffered a transcript reflecting that part of the statement was "unintelligible." Two detectives testified that the tape and the transcript were both accurate. Appellant testified that the transcript was in error and the officers misunderstood him. The trial court listened to the recording, concluded that the police transcription was correct, and allowed the jurors to use it as a guide while they heard the recording of the actual statement. The trial court stated that appellant could argue to the jury that the transcript was in error.

■ The issue is one of authenticity. Rule 901 of the Arkansas Rules of Evidence governs authenticity and provides that authenticity may be determined by a trial court by comparing an authenticated item with a copy. The trial judge heard the testimony and compared the transcript with the taped statement and made his finding. Appellant offers nothing on appeal other than his testimony and the tape to show that the trial court abused its discretion in admitting the transcript. We cannot say that the trial court abused its discretion in weighing the evidence presented.

In *Harvey*, 292 Ark. at 271, 729 S.W.2d at 408, we said that we have reservations about admitting police transcripts into evidence. We still have that concern, and in that vein we note that Rule 901 provides for proof when, as here, there are characteristics of speech or dialect that might be misunderstood. Here the trial court had nothing but the testimony of the detectives, the testimony of appellant, and the tape. There is no proof indicating whether a characteristic of ethnic speech or the dialectic pronunciation of a word might show that the detectives and the transcript were in error.

■ In addition to comparing the tape to the transcript, the trial court gave the following cautionary instruction to the jury:

> I need to instruct you, ladies and gentlemen — we're about to play an audio tape, as you well know. I'm instructing you that in the case of any variation that you might perceive between the audio tape and the typed transcript that we're going to let you read, you're to be guided by the tapes themselves, you understand, of what you hear and not by the transcript that you're going to be handed to read.

Moreover, appellant argued to the jury that the transcript was in error. Under these conditions, even if the trial court's ruling had been in error, it is doubtful that appellant would have been able to show prejudice. *See Leavy*, 314 Ark. at 235, 862 S.W.2d at 833.

## II.

Detective Joe Oberle of the Little Rock Police Department testified that he went to appellant's mother's home to search for

the weapon that was used to kill Officer Callanen. In the presence of Oberle, Ms. Childress phoned appellant, who was in the Living Hope Institute, a division of Doctors Hospital in Little Rock, and asked what he had done. Detective Oberle testified that Ms. Childress said, "Why didn't you tell me?" and then instructed appellant to get on the phone and tell Oberle what he needed to know. Oberle took the phone, identified himself as a policeman, and asked, "What's up?" Appellant told him that Foreman shot Callanen. Oberle asked about the pistol, and appellant responded that he did not know where it was. This conversation took place about 1:00, and appellant's first custodial statement took place at about 3:00 that same afternoon.

Appellant argues on appeal that the two subsequent custodial statements should have been suppressed because Detective Oberle did not give him a *Miranda* warning on the phone, and the two custodial statements were the result of his telephone statement to Detective Oberle; thus, they were "fruit of the poisonous tree." *See Wong Sun* v. *United States*, 371 U.S. 471 (1963).

The State did not attempt to introduce the voluntary non-custodial, but unwarned, incriminating statement by appellant, and on that we make no comment. We address only the point argued.

■ In *Oregon* v. *Elstad*, 470 U.S. 298 (1985), the Court addressed this issue, and we paraphrase the opinion as it applies to the case before us. The "fruit of the poisonous tree" doctrine assumes the existence of a constitutional violation. Violations of the Fourth Amendment's prohibition against unreasonable search or seizure are constitutional violations. Thus, when there is a Fourth Amendment violation, and a subsequent confession, it should be excluded unless intervening events break the causal connection between the Fourth Amendment violation and the confession so that the confession is "sufficiently an act of free will to purge the primary taint." *Taylor* v. *Alabama*, 457 U.S. 687, 690 (1982) (quoting *Brown* v. *Illinois*, 422 U.S. 590, 602 (1975)).

■ In the case before us there is no allegation of a Fourth Amendment violation. Rather, the allegation is that appellant was not given a *Miranda* warning before he gave the initial non-custodial statement and that this tainted the two later custodial statements. The Self-Incrimination Clause of the Fifth Amendment

does not proscribe voluntary confessions. "Indeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable. . . . Absent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions." *United States* v. *Washington*, 431 U.S. 181, 187 (1977). In *Miranda*, the Court presumed that interrogation in custodial circumstances is inherently coercive and statements made under those circumstances are inadmissible unless the suspect is told of his *Miranda* rights and intelligently decides to forego those rights. *New York* v. *Quarles*, 467 U.S. 649, 654 (1984); *see also Miranda* v. *Arizona*, 384 U.S. 436 (1966). However, the *Miranda* rights are "not themselves rights protected by the Constitution but instead measures to insure that the right against compulsory self-incrimination [is] protected." *Michigan* v. *Tucker*, 417 U.S. 433, 444 (1974). Thus, a procedural *Miranda* violation is not necessarily a violation of the Constitution, and the "fruits" doctrine may not be applicable. Based on the foregoing, the Court in *Oregon* v. *Elstad* held that the Self-Incrimination Clause of the Fifth Amendment does not require the suppression of a confession, made after proper *Miranda* warnings and a valid waiver of rights, solely because the police had obtained an earlier voluntary, but unwarned, admission from the suspect. The same reasoning is fully applicable to the case at bar.

### III.

Appellant's third point of appeal involves a ruling the trial court made during the direct testimony of Ronnie Smith, one of the officers who took appellant's two custodial statements. On direct examination in the State's case-in-chief, a deputy prosecutor asked Smith the reason the detectives took a second statement from appellant. Smith replied that after taking the first custodial statement they took the statement of appellant's co-defendant, Foreman, and they came to the conclusion that appellant had been less than forthright in his first statement. Appellant objected and moved for a mistrial as follows: "Here's now the inference that there's other evidence that's being held from this jury because we cannot play Mr. Foreman's statement to this jury. I'll move for a mistrial." The trial court denied the motion for a mistrial. Shortly afterwards, appellant moved for "some type of admonishment to the jury." The trial court denied the motion.

■ On appeal, appellant contends that the trial court's evidentiary ruling was in error because the comment about the co-defendant's statement denied his Sixth Amendment right to confront the co-defendant, and the testimony that appellant was not forthright constituted an impermissible comment on the evidence. The arguments are procedurally barred. Appellant's objection was to the "inference" that evidence was being withheld from the jury. An objection that there was an "inference" that evidence was being withheld neither raised nor embraced a denial of confrontation or the Sixth Amendment argument. The trial court was never apprised of the Sixth Amendment argument or a comment on the evidence argument, and we will not consider alleged errors that were not brought to the attention of the trial court. *Terry* v. *State*, 309 Ark. 64, 826 S.W.2d 817 (1992).

## IV.

Later, during the presentation of appellant's case, a bench conference was held. The State objected to the proposed testimony of some of appellant's witnesses. The trial court apparently realized that extensive argument was to be made and stated to the jury: "We've got to take a recess here while we discuss some evidence that may or may not be coming in the case, so we're going to take a short recess." Appellant objected and contended that the statement constituted a comment on the evidence. On appeal, he again contends that the statement constituted a comment on the credibility of the witnesses.

■ The only way to determine the real meaning or true import of any isolated remark is to consider the place in the trial and the context in which it was made. *Harris* v. *State*, 273 Ark. 355, 620 S.W.2d 289 (1981). Here, the remark was made after a bench conference and the trial court realized the arguments would be more fittingly heard in chambers. The context of the remark informed the jurors that they could take a short recess, the reason they could have the recess, and did not specifically refer to any testimony or intimate that any witness was credible or not credible. It was not a comment upon the evidence.

The cases cited by appellant are factually distinguishable. In *McAlister* v. *State*, 206 Ark. 998, 178 S.W.2d 67 (1944), the trial judge said that to grant the appellant's motion to question a witness "would be just silly." In *West* v. *State*, 255 Ark. 668,

501 S.W.2d 771 (1973), the trial judge asked witnesses how much they had been paid to come up with some information. In both cases this court held that these remarks could only have the effect of prejudicing the appellants in front of the jury. Here there is no such showing.

V.

Appellant's next four points of appeal involve evidentiary rulings.

A.

One of these four points concerns a ruling during cross-examination of appellant about a red bandanna and gang activity. Prior to trial, appellant filed a motion asking that there be no mention at trial of the fact that he was a member of a gang. The deputy prosecutor replied that the confession contained a reference to appellant's gang activity and the statement was admissible. The trial court agreed, but cautioned the deputy prosecutor not to mention such activity "unless there's some reason that involves the trial."

Testimony in the State's case-in-chief established that a red bandanna was found near the crime scene. After the State rested appellant took the witness stand and, on direct examination, stated that Foreman had a red bandanna tied around his neck at the time Foreman shot the officer. His counsel asked him to explain the red bandanna, and appellant replied, "Well, you know, like I said before, I used to be a 'Blood' [gang member]. You know, he had his bandanna [gang symbol] on." On cross-examination, a deputy prosecutor questioned appellant about the red bandanna found at the crime scene and asked appellant if he was a "Blood." Appellant's objection to relevance was overruled. Appellant replied that he formerly was a member of the "Bloods." The deputy prosecutor then asked appellant if he carried a red bandanna in his pocket. Appellant's objection to relevancy was overruled.

Appellant testified on direct that the red bandanna found at the crime scene was not his, but rather belonged to Everett Foreman. He raised the issue of the red bandanna's ownership; thus, he could not complain about the prosecutor's cross-examination of him on that issue. *Williams* v. *State*, 288 Ark.

444, 705 S.W.2d 888 (1986). A party cannot complain about that for which he is responsible. *Womack* v. *State*, 301 Ark. 193, 783 S.W.2d 33 (1990).

 As a subpoint of this assignment, appellant additionally argues that the State was attempting to impeach him with prior criminal acts, *see* A.R.E. Rule 404(b). However, this argument was not made to the trial court, as his objection was to "this mentioning of gangs." It is well settled that a party cannot change argument on appeal. *Stewart* v. *State*, 320 Ark. 75, 894 S.W.2d 930 (1995). Even in cases such as this where the sentence is life without parole, our duty is only to examine the record for error on objections decided adversely to appellant, not to address arguments that might have been made. *See* Ark. Sup. Ct. Rule 4-3(h).

### B.

Appellant's next point involving an evidentiary ruling came about as follows. Titonia Butler testified that she knew Officer Callanen, lived near the McDonald's restaurant, saw the robbers hiding, sensed what was about to happen, saw the robbery, heard the shots, called an ambulance, went to the restaurant, and saw Officer Callanen lying on the parking lot. She gave a statement to the police soon after they arrived. At trial, on cross-examination, she admitted that her testimony was inconsistent with part of her statement given the night of the murder. On redirect, she attempted to explain the inconsistencies by testifying that she was in shock after witnessing the murder. The deputy prosecutor asked how she felt seeing Officer Callanen, someone she knew and liked, lying on the ground. Appellant objected on the basis of relevance. The trial court overruled the objection.

 The basic function of redirect examination is to enable the witness to explain and clarify any relevant matters that have been weakened, confused, or obscured by cross-examination, and to rebut the discrediting effect of any damaging statements or admissions or to correct any wrong impression that may have been created. *Easter* v. *State*, 306 Ark. 452, 815 S.W.2d 924 (1991). A trial judge may exercise discretion in allowing the party to evoke on redirect examination some matter which is relevant to his case or defense and which through oversight he has failed to elicit on direct. *Easter*, 306 Ark. at 455, 815 S.W.2d at 926; *see also* John William Strong, *McCormick on Evidence* § 32

at 108 (4th ed. 1991). A skillful re-examiner, then, may "draw out the sting of lethal cross-examination" by eliciting a reply on direct which explains matters of impeachment of the cross-examiner. Strong, *supra*, at 108-09. Here, prosecutor's question on redirect was designed to give the witness the opportunity to explain the reason she was upset and under stress when she gave her initial statement. The testimony was relevant to an assessment of her credibility as a witness. Credibility is a fact of consequence to the determination of an action under A.R.E. Rule 401.

## C.

Tracy Brooks, co-defendant Everett Foreman's girlfriend, gave a statement to police in which she said that appellant planned the robbery and Foreman shot Officer Callanen. She said that she heard appellant talk about robbing McDonald's on several occasions.

Ms. Brooks later avoided service of a subpoena and was so evasive that the trial court found it necessary to cite her for contempt. Ultimately she was brought into court on a forthwith subpoena. She unsuccessfully sought to invoke the Fifth Amendment. Subsequently the State granted her immunity, but still she refused to testify.

Judy Rudd, an attorney who independently contracts with the State of Arkansas to handle civil commitments for the Public Defender's office, privately represented Ms. Brooks and advised her to take the Fifth Amendment. Appellant contends there was an inherent conflict of interest in allowing Ms. Rudd to represent Ms. Brooks, because his attorney was employed by the same Public Defender's office.

In *Burger* v. *Kemp*, 483 U.S. 776 (1987), the Supreme Court acknowledged there is a possibility that prejudice will result when partners represent co-defendants, and the risk is increased when the two lawyers cooperate with one another in the planning and conduct of trial strategy, although this does not justify an inflexible rule that presumes prejudice in all cases. *Id.* at 783. The test for prejudice is whether the attorneys "actively represented conflicting interests." *Id.* In *Burger*, the Court said that it had in the past "assumed without deciding" that two law

partners were considered one attorney. *Id.*; *see also Holloway* v. *Arkansas*, 435 Ark. 475, 482 (1978).

Here, Ms. Rudd and appellant's attorney actively represented conflicting interests. Therefore, the question is whether Ms. Rudd and appellant's attorney should be considered to have a relationship comparable to being "partners." The trial court held an extensive hearing on the issue and made a finding of fact that they were not in such a relationship.

A helpful definition of the word law "firm" is contained in the comment to Model Rules of Professional Conduct 1.10. This rule deals with imputed disqualification of lawyers in the same firm who represent adverse interests. The comment provides that the term "firm" includes a legal services organization such as the one involved in this case. However, it goes on to say:

> Lawyers employed in the same unit of a legal service organization constitute a firm, but not necessarily those employed in separate units. As in the case of independent practitioners, whether the lawyers should be treated as associated with each other should depend on . . . the specific facts of the situation.

Comment to Model Rules of Professional Conduct 1.10.

■ Here, there was testimony that Ms. Rudd and appellant's attorney were employed in different units of the Public Defender's office. Ms. Rudd handles civil commitment cases, and she testified that she did not have access to any of the other files or to any other information about the criminal cases. Her supervisor, Bill Simpson, testified that she was not involved in criminal cases, but that she was employed only to handle civil commitments. Ms. Rudd's representation of Ms. Brooks was in her private practice, and she was not paid by the Public Defender's office to represent Ms. Brooks. Given these specific facts, we cannot say the trial court's finding of fact was clearly erroneous.

## D.

■ Appellant next contends that the trial court erred in refusing to grant a mistrial because of the trial court's cumulative error. We have stated that we will "entertain an argument of cumulative error in rare and egregious cases." *Vick* v. *State*, 314

Ark. 618, 617, 863 S.W.2d 820 (1993). We have reversed only when the cumulative effect of the errors committed denied the defendant a fair trial. See *Dillon* v. *State*, 311 Ark. 529, 844 S.W.2d 944 (1993) (finding that net effect of "overly zealous" comments by prosecutor, unsupported by evidence, combined to taint jury's decision); *Alexander* v. *Chapman*, 289 Ark. 238, 711 S.W.2d 765 (1986) (reversing when there were twenty-eight objections by appellant to leading questions, appellee was repeatedly admonished by trial judge and objections sustained but appellee's conduct not stopped); *Harris* v. *State*, 264 Ark. 391, 572 S.W.2d 389 (1978) (reversing when cumulative errors, omissions, and deficiencies in warrant were sufficient to undermine court's confidence in it). There was no combination of errors in this case that deprived appellant of a fair trial.

An examination of the transcript has been made in compliance with Rule 4-3(h) of the Rules of the Supreme Court, and there is no reversible error on any other ruling adverse to appellant.

Affirmed.