Charles **PILLETTE**, Petitioner,

v.

Dale E. **FOLTZ**, Respondent.

Civ. A. No. 82–72582.

United States District Court,
E.D. Michigan, S.D.

Feb. 22, 1984.

Ward F. McDonough, Jr., Detroit, Mich., for petitioner.

William L. Cahalan, Pros. Atty. by Edward Reilly Wilson, Chief Appellate Asst. Pros. Atty., Timothy A. Baughman, Principal Atty., Detroit, Mich., for respondent.

## OPINION

GILMORE, District Judge.

This matter is before the Court upon Pillette's petition for a writ of habeas corpus. Petitioner has exhausted all state remedies and is presently incarcerated for life in the State Prison of Southern Michigan on two convictions of criminal sexual conduct in the first degree. For the reasons given in this opinion, the Court denies the petition for habeas corpus.

### I

Petitioner and Scarlet Smith were both charged with one count of felony murder in the perpetration of rape, one count of first degree premeditated murder, and two counts of first degree criminal sexual conduct. The charges arose out of the alleged sexual assault and murder of defendant Smith's three year old daughter, Josette Smith. Following a jury trial, petitioner was convicted of felony murder, and Smith of second degree murder as a lesser included offense under the felony murder count. Both petitioner and Smith were also found guilty of two counts of criminal sexual conduct in the first degree, but were acquitted of first degree premeditated murder. Both were sentenced to three terms of life imprisonment. In an unpublished opinion, the Court of Appeals of Michigan set aside Pillette's conviction of felony murder, and reduced the conviction to that of manslaughter, but let stand the conviction on two counts of criminal sexual conduct (No. 77-2418) (1980). The Michigan Supreme Court denied leave to appeal, 411 Mich. 875 (1981).

The facts surrounding the case are shocking, but need to be set forth. Petitioner and Smith acknowledged that they had beaten Josette for disciplinary reasons at petitioner's house on October 4, 1976. Petitioner said, both at trial and in statements to police, that Josette had been disobedient and defiant on that date, that he wished to cure her of her bad habits, and that he had intermittently struck her with his hands, his leather belt, a switch, and a broomstick over a period of approximately six hours. He also stated that he and Smith had taped her to a kitchen chair for some time so he could strike her on the buttocks without her attempting to escape.

Smith admitted at trial and to the police that she had participated in striking Josette with a stick and the broomstick, although much less extensively and frequently than Pillette.

Pillette claims that after approximately six hours of the above-described disciplinary measures, he and Smith gave Josette a bath and noticed that she was becoming very limp and unresponsive. He testified they put her on a couch in the living room for about two hours, and then realized that she had stopped breathing. They left her on the couch for the night and began formulating plans to dispose of her body. After rejecting several schemes, they buckled petitioner's belt around her body, encased the body in plastic garbage bags, and placed her in the cooler in petitioner's garage.

At trial, a forensic pathologist who performed an autopsy on Josette testified that the child died as a result of multiple injuries sustained during a beating inflicted shortly before her death. He further found pinpoint hemorrhages in her eyes, indicating death by asphyxiation. The pathologist further testified that the child's external genitalia and hymen revealed signs of tearing and laceration, and that the injuries were the result of a sexual assault and not the result of a beating. He could not precisely identify the object used to inflict the injuries, and testified that, while the injuries were not inconsistent

with those caused by a human penis, he could only ascertain that they were inflicted with a blunt object. He found no sperm on or inside the child's body.

Smith acknowledged that, as part of a preconceived mutual plan of coverup, she drove to a K-Mart store on the day following Josette's death and telephoned the police to report her child missing, and possibly kidnapped, from her car in the parking lot. Next, according to their plan, Smith called petitioner, and he met her at the store. Both were escorted to the Sixteenth Police Precinct in Detroit for further questioning concerning the alleged kidnapping. After a few hours, the police became suspicious about inconsistencies between Smith's and petitioner's separate accounts of their whereabouts the previous night, and took petitioner to Detroit Police Headquarters at 1300 Beaubien Street in Detroit and booked him on suspicion of murder. Eventually both made statements to the police concerning their beating of Josette the previous day, and revealed the location of her body.[1]

Sometime in the early morning hours of the next day, petitioner was taken to the Taylor, Michigan, Police Department where he made a lengthy written confession. Both confessions were admitted into evidence at the trial. Defendant took the stand in his own defense and testified in a manner substantially similar to the statements he gave. During the confessions and during his testimony at trial, petitioner admitted the beatings, but consistently denied committing any sexual assault on the child.

## II

Petitioner makes seven constitutional claims in his writ of habeas corpus. Only two of these claims have merit and require the attention of this Court. The first is

---

1. Petitioner's statement was testified to by Lieutenant Riedel, of the Detroit Police: "I wrote this statement and it goes as follows: 'Scarlet Smith is my girlfriend. I plan on marrying her. Scarlet is also the mother of Josette. Scarlet lives with me about three or four days of the week. Josette also stays with us. And in the past, Scarlet and I had trouble with disciplining Josette. We gave her lickings that would do some good only part of the time. On Sunday in the morning sometime I had trouble with her. It wasn't over much. It was over picking her braids apart and lying. At that time I made her stand in the corner and bend down and hold her ankles. Then she began lying by saying she had to go to the bathroom when she didn't have to go. After she began to lie, I began to whip her on the butt with my belt, but she would have moved. I then tied her to a kitchen chair. I taped her wrists so she wouldn't get any bruises.' " Lieutenant Riedel then testified that he interjected a question: "Did Scarlet beat her at this time?" He testified petitioner's answer was "I got tired of beating her, so I cut a branch off of the tree and gave it to Scarlet. She beat Josette with the switch for awhile and then it broke. I got tired of hitting her with a belt, so I hit her with a piece of broom handle. I figured that would straighten her out, but it didn't. She stopped struggling and got relaxed. We got scared and Scarlet says, 'What if she is dying?' I said this would be the first one from being beaten on the ass. I then cut her loose and wanted to take her to the hospital. Scarlet said we couldn't, because the baby was bruised and she didn't want to go to jail for child abuse. I

said, okay, but we would watch her closely. We put her in the bathtub and started to give her a bath. We tried to wash her but she wouldn't sit up. We took her out and tried to dry her and then she shit herself, so I gave her another bath and put on one of my tee shirts and put her to bed. I made a milkshake for her, but she wouldn't drink it. I set her by the table and then some water came out of her mouth. Scarlet picked her up and more water came out of her mouth, only. I then put her on the couch and later checked on her about nine p.m. and she wasn't breathing. She was dead. I picked her up and more water came out of her mouth. We covered her up and Scarlet was crying. We didn't do anything that night. We talked about it, all night. It kept bugging us. We didn't call the police because we were afraid of going to jail. We thought of other ways to get out of it. Scarlet said she knew of a place where there was a swift undercurrent and could say we went fishing and she fell in. I didn't think it would work, so we drank wine and smoked a couple of joints and went to sleep. The next day Scarlet thought of a kidnapping scheme and I told her to go to K-Mart and pick up stuff for me and to call the police from there." Lieutenant Riedel then testified "I asked him a question 'What did you do with the body?' and his answer was 'We didn't know what to do with it. It started to smell on the couch, so we started to put it in a plastic bag and put it in the garage.' "

"What part of the garage did you put it?"

"The Coleman Cooler that is on the bottom shelf of the back wall." Lieutenant Riedel then testified that the petitioner signed the statement.

that petitioner was deprived of Fourth and Fourteenth Amendment rights when his arrest was made without probable cause, and was deprived his Fifth Amendment due process rights when the trial court failed to suppress the confessions which resulted from an alleged illegal arrest. The other claim of substance is that petitioner was denied his constitutional right to effective assistance of counsel when trial counsel failed to challenge the lack of probable cause for the arrest of the petitioner and allowed the fruits of that arrest, namely, the confessions, to be used against the petitioner.

■ Under normal circumstances, this Court would be precluded from reviewing the legality of petitioner's arrest due to the contemporaneous objection rule, as no objection to the introduction of the fruits of the arrest was made at trial. *Engle v. Isaac*, 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Under *Sykes*, an adequate and independent state procedural ground—e.g. a state contemporaneous objection rule which would prevent direct review of an issue—will bar federal habeas relief absent a showing of "cause" and "prejudice." In *Sykes*, the court said:

> We therefore conclude that Florida procedure did, consistently with the United States Constitution, require that respondent's confession be challenged at trial or not at all, and thus his failure to timely object to its admission amounted to an independent and adequate state procedural ground which would have prevented direct review here... We thus come to the crux of this case. Shall the rule of *Francis v. Henderson, supra* [425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149], barring federal habeas review absent a showing of "cause" and "prejudice" attendant to a state procedural waiver, be applied to a waived objection to the admission of a confession at trial?

We answer that question in the affirmative.

*Id.* at 86–7, 97 S.Ct. at 2506.

Michigan Rules of Evidence 103(a), like Rule 103(a) of the Federal Rules of Evidence, provides that "error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected" and an objection or offer of proof is made to the court. Counsel in the instant case failed to comply with this rule as they did not file a motion to suppress or in any way object to the admission of the confessions on the grounds they were obtained after an illegal arrest, except that they did object to the introduction of the evidence of the written confession midway through trial on the grounds that it was obtained in violation of *Miranda*.[2] Therefore, under *Sykes*, petitioner is precluded from raising the failure of the trial court to exclude this evidence as a constitutional defect, absent a showing of "cause" and "prejudice."

Petitioner argues that the incompetence of his counsel is "cause" for the procedural defect under *Sykes*, and, therefore, he should not be precluded from raising this issue on habeas. In *Isaac, supra*, the petitioner advanced a similar argument, and in holding that the attorney's failure to object to a jury instruction was not "cause" for the procedural default, the court stated:

> We might hesitate to adopt a rule that would require trial counsel either to exercise extraordinary vision or to object to every aspect of the proceedings in the hope that some aspect might mask a latent constitutional claim. On the other hand, later discovery of a constitutional defect unknown at the time of trial does not invariably render the original trial fundamentally unfair.

*Id.* 456 U.S. at 131, 102 S.Ct. at 1573.

At least two Sixth Circuit cases have taken this approach to reject ineffective assistance of counsel claims based on the failure of trial counsel to object to jury instructions. *Jones v. Jago*, 701 F.2d 45 (6th Cir.1983); *Nieb v. Jago*, 695 F.2d 228

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct.      1602, 16 L.Ed.2d 694 (1966).

(6th Cir.1982), *cert. denied*, — U.S. —, 103 S.Ct. 3544, 77 L.Ed.2d 1393. Implicit in *Isaac*, as well as these holdings, however, are findings that defense counsel were competent in all respects, including their failure to object to the jury instructions. If there is truly ineffective assistance of counsel so as to raise a Sixth Amendment claim, it must follow that *Sykes* and *Isaac* will not prevent this Court from considering the admissibility of the confessions.[3]

*Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), throws another obstacle to petitioner's obtaining habeas relief insofar as it bars habeas relief based on Fourth Amendment claims that have been fairly and fully litigated in state court. Specifically, *Powell* bars habeas relief on the ground that evidence was introduced that was obtained from an unlawful search or seizure. The rationale for the decision is that the purpose of the exclusionary rule—to deter overreaching police conduct—will not be served by excluding evidence of an unlawful search or arrest on habeas because it is too far removed from the arrest and search to influence police action. According to the *Powell* court:

> [W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial. In this context the contribution of the exclu-

sionary rule, if any, to the effectuation of the Fourth Amendment is minimal and the substantial societal costs of application of the rule persist with special force.

*Id.* at 494–5, 96 S.Ct. at 3052–3.

A strict reading of *Powell* would preclude habeas consideration of the Fourth Amendment claim here. However, the question remains whether *Powell* bars consideration of petitioner's Fourth Amendment claim as part of a broader claim of ineffective assistance of counsel. In *LiPuma v. Commissioner*, 560 F.2d 84 (2d Cir. 1977), *cert. denied*, 434 U.S. 861, 98 S.Ct. 189, 54 L.Ed.2d 135 (1978), the Second Circuit held that *Powell* could not be circumvented by bringing an ineffective assistance of counsel claim on the basis of counsel's failure to raise a Fourth Amendment claim at trial. In *LiPuma*, the defendant had failed at state trial to file a timely motion to suppress the fruits of an allegedly unlawful search, and instead sought to suppress the evidence midway through the trial. This last minute effort was unsuccessful as the state law governing the *LiPuma* case prohibited state trial judges from hearing Fourth Amendment claims at midtrial. The Second Circuit held that *Powell* barred federal habeas review of the petitioner's Sixth Amendment claim grounded on alleged Fourth Amendment violations. However, it also considered, and rejected on the merits, the ineffective assistance of counsel claim.[4]

---

3. *Raper v. Mintzes*, 706 F.2d 161 (6th Cir.1983), also raises doubt as to the applicability of *Sykes* to the case at bar. The court held that *Sykes* is inapplicable where the state appellate court has had the opportunity to address the constitutional question and has chosen not to apply its procedural rules so as to bar the claim. Here, the Michigan Court of Appeals rejected petitioner's Fourth Amendment claim. Like the state appellate decision in *Raper*, the basis for the decision of the state appellate court in this case is unclear. There is no reason to assume, however, that the court's denial of the claim was based on a procedural defect arising out of a contemporaneous objection rule. The court did not base its denial on procedural grounds, but stated simply that the claim was denied for lack of merit. Therefore, based on *Raper*, this Court is not precluded from considering the merits of the illegal arrest issue.

4. A recent law review note criticizes the *LiPuma* court for failing to adequately distinguish defendant's Sixth Amendment claim from his Fourth Amendment claim. Note, *Stone v. Powell and the Effective Assistance of Counsel.* 80 Mich.L.Rev. 1326 (1982). In this note, the author suggests that the extension of *Powell* by the *LiPuma* court to Sixth Amendment claims is unwarranted because the purpose of the exclusionary rule is unrelated to the assessment of the conduct of an attorney who has failed to assert competently the Fourth Amendment claim at trial. Further, it claims the *Powell* court did not preclude all review of Fourth Amendment claims, but preserved habeas review when necessary to protect a defendant's opportunity to fully and fairly litigate his claims in state court. Effective assistance of counsel is essential to a fair state court trial, the note

This issue has not been squarely addressed by the Sixth Circuit. In *Riley v. Gray*, 674 F.2d 522 (6th Cir.1982), *cert. denied*, 459 U.S. 948, 103 S.Ct. 266, 74 L.Ed.2d 207, the court, following most circuit courts, held that *Powell* does not prevent habeas review of a Fourth Amendment claim where the state trial court did not fully and fairly litigate the issue. At issue in that case was the propriety of considering a Fourth Amendment claim on habeas where the state court had found that the defendant did not have standing to object to the search. *Fornash v. Marshall*, 686 F.2d 1179 (6th Cir.1982), *cert. denied*, — U.S. ——, 103 S.Ct. 1439, 75 L.Ed.2d 796, involved an ineffective assistance of counsel claim based on counsel's failure to raise a Fourth Amendment claim. The court decided the Sixth Amendment claim on the merits, stating:

We are assuming without deciding that *Stone v. Powell* ... does not apply to a claim of ineffective assistance of counsel which is grounded in trial counsel's failure to assert a Fourth Amendment claim....

*Id.* at 1188, n. 11.

It therefore becomes clear that this Court must consider petitioner's Sixth Amendment claim grounded on alleged Fourth and Fifth Amendment violations. It is clear that a defendant is deprived of a full and fair litigation of the merits of his or her Fourth and Fifth Amendment claims when he or she is not afforded effective assistance of counsel. This approach is consistent with the Sixth Circuit's decisions in *Riley* and *Fornash, supra.*

### III

The Sixth Circuit has articulated the test for ineffective assistance of counsel in *Beasley v. United States*, 491 F.2d 687 (6th Cir.1974). According to the *Beasley* court:

Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest.... Defense counsel must investigate all apparently substantial defenses available to the defendant and must assert them in a proper and timely manner.

*Id.* at 696.

*Beasley* also ruled that the harmless error rule does not apply in regard to the deprivation of a procedural right so fundamental as effective assistance of counsel. *Id.* at 696. The standard of review for ineffective assistance of counsel claims articulated by *Beasley* was elaborated upon in *United States v. Yelardy*, 567 F.2d 863 (6th Cir.1978), *cert. denied*, 439 U.S. 842, 99 S.Ct. 133, 58 L.Ed.2d 140:

While, as we stated in *Beasley*, the harmless error test is inapplicable to proven claims of ineffective assistance of counsel, the court must first find counsel's performance constitutionally deficient, and that evaluation inevitably turns in large part on the soundness of counsel's legal judgments.... Although we have rejected the idea that an attorney's errors may be held entirely harmless, they must first be errors.

*Id.* at 865, n. 1.

And in *Williams v. Abshire*, 544 F.Supp. 315, 318 n. 2, (E.D.Mich.1982), *aff'd*, 709 F.2d 1512, Judge Joiner stated "While a violation of the Sixth Amendment right to effective assistance of counsel may never be deemed harmless error ... prejudice must first be shown to establish a constitutional violation." [5]

Applying these legal principles here, the Court must determine if a reasonably competent attorney would have challenged the legality of petitioner's arrest in order to suppress evidence of petitioner's confessions, and to prevent him from having to take the witness stand and testify to the

---

argues, and it follows, according to the author, that habeas review of Sixth Amendment claims is fully consistent with the values reflected in *Powell.*

5. The United States Supreme Court has granted certiorari to decide the standard of review to be applied to ineffective assistance claims. *Washington v. Strickland*, 693 F.2d 1243 (5th Cir. 1982), (en banc); *cert. granted*, — U.S. ——, 103 S.Ct. 2451, 77 L.Ed.2d 1332 (1983).

very same facts before the jury, as he did in this case. To make this determination, it is necessary to assess the likelihood of petitioner prevailing on the merits of his Fourth and Fifth Amendment claims.[6] In assessing these claims, a careful analysis of the facts is necessary.

The circumstances leading to petitioner's arrest and confessions began with a telephone call from Smith to the police at approximately 1:00 p.m. on the day after Josette's death, reporting that Josette had just been kidnapped from her car while she was shopping at the K-Mart store. Smith also telephoned petitioner from the store to inform him of the kidnapping, and he immediately drove to meet her there. The Detroit Police drove them around the immediate vicinity to look for the missing child and then took them to the Sixteenth Precinct Police Station for questioning. Petitioner was asked to state his whereabouts earlier that day, and he apparently told the truth that he and Smith had gone fishing in Monroe, Michigan, but had only stayed a short while and then drove to the Detroit River behind Wyandotte General Hospital and drank wine before proceeding home. At approximately 5:40 p.m., Smith, who was being questioned separately, stated that she and Petitioner had been in Monroe all night, until 4:00 a.m., fishing. Upon noting inconsistencies between these two accounts of their whereabouts in the early morning hours, petitioner was taken to the Detroit Police Headquarters at 1300 Beaubien Street and formally placed under arrest on suspicion of murder.

The record indicates that interrogation of Smith continued at the Sixteenth Precinct until she changed her story and stated that her daughter had fallen into the water and drowned while fishing. She was then taken to 1300 Beaubien Street and permitted to see petitioner. They met for several minutes in order to console one another, and the record reflects that during that meeting they decided to confess. Petitioner then made an oral confession to Lieutenant Riedel. The statement was read into evidence, and is about three and one-half pages long. It is undisputed that prior to this statement petitioner was read his *Miranda* rights and waived the presence of counsel. Smith gave her formal confession to Officer Babuik.

At some time in the early morning hours of October 6, Petitioner and Smith were taken to the Taylor, Michigan, Police Station. Petitioner was read his *Miranda* rights and began making an oral confession to Officer Hastings. Hastings stopped him, and returned after a few minutes with a stenographer. He reread petitioner his *Miranda* rights. Petitioner then gave a written statement that covers more than 20 transcript pages.

Petitioner argues that his initial detention, that is the transporting him in a police car from the K-Mart store to the Sixteenth Precinct, was the equivalent of an arrest. He argues that the officers did not have probable cause to arrest him at this time because they had no information other than the statement from Smith that she had left her daughter in the car while she shopped, and that the infant was gone when she returned. Petitioner contends that all of the statements made to the police following this detention were tainted by an illegal arrest and should not have been admitted into evidence, and he argues that the failure of counsel to challenge the legality of this arrest was inexcusable and constituted incompetent representation. He further argues that the admission of these statements into evidence devastated his defense and forced him to take the witness stand

---

**6.** Petitioner's counsel has suggested that an evidentiary hearing is needed to evaluate counsel's representation during the state court proceedings and to evaluate the merits of the constitutional claims. The Court does not feel that an evidentiary hearing is necessary because the Court has the benefit of the complete trial transcript. It should also be noted that petitioner's trial took place seven years ago, and it is unlikely that facts could be reconstructed at an evidentiary hearing that have not already been gleaned from the multi-volume transcript. As pointed out in *United States v. Yelardy*, 567 F.2d 863, 866 (6th Cir.1978), "The touchstone in the vast majority of right-to-counsel cases is the trial record itself."

and testify to practically the same facts before the jury.

The government, on the other hand, argues that petitioner was not under arrest when he was first taken to the station for questioning, but suggests that at that time the police were merely investigating a kidnapping and seeking more information. The police officers testified that petitioner was not placed under arrest until they noticed inconsistencies between petitioner's and Smith's accounts of their whereabouts the previous evening. They argue that there was certainly probable cause to arrest petitioner at the time of his first confession as Smith had already changed her kidnapping story, implicating petitioner in the accidental drowning story, and at the time of his second confession, as Smith had already confessed to the beating death of the child, again implicating petitioner.

## IV

■ On the basis of the factual record before us, the Court finds it unlikely that petitioner would have prevailed on the merits of the Fourth and Fifth Amendment claims. First, it is doubtful that petitioner was placed under an illegal arrest. Second, even if petitioner's arrest was illegal, it is likely that the confessions would nonetheless have been deemed admissible because they were elicited under circumstances which strongly suggest that they were voluntary and free of the taint of any illegalities surrounding the arrest.

It is axiomatic that the Fourth Amendment guarantees that no arrests shall be made except upon probable cause to believe that the individual is committing, or has committed, a crime. Probable cause exists where the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a reasonable person in the belief that a crime has been, or is being, committed. *Brinegar v. United States,* 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

The Court is of the opinion that at the time the petitioner was taken from the K-Mart Store to the Sixteenth Precinct he

was not under arrest. The police at that point had a potential kidnapping case on their hands and were justified in seeking further information from petitioner regarding the disappearance of the child. It might be argued that taking the petitioner to the precinct and placing him in a room separate from Smith is suggestive of custodial detention. But it is important to note that petitioner and Smith are the ones who initiated the contact with the police and pretended to seek out police assistance in finding Josette.

At the time the police took petitioner to police headquarters at 1300 Beaubien Street, he clearly was under arrest. But it appears to the Court that at that time there was probable cause to arrest the petitioner because there were seriously conflicting stories about the previous evening. Pillette had stated that he and Smith drank wine at the Detroit River behind the Wyandotte General Hospital, and Smith had stated that she and Pillette were in Monroe fishing all night. In any event, prior to petitioner's oral confession to Lieutenant Riedel, Smith had changed her kidnapping story and implicated petitioner in the accidental drowning story.

The facts in this case are entirely different from those in a line of Supreme Court cases involving similar Fourth and Fifth Amendment claims, *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), and *Taylor v. Alabama,* 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982). In *Taylor* a person who was incarcerated on unrelated charges told an officer that "he had heard that (the petitioner) was involved in the robbery." The police arrested the petitioner solely on the basis of this information, even though the informant had never before given similar information to the officer, did not indicate where he had gotten the information, and did not provide any details of the crime. Similarly, in *Brown* two detectives apprehended the petitioner outside of his apartment and placed him under arrest for murder. The Court unhe-

sitatingly found the arrest was made without probable cause, as the only information concerning the petitioner within the officer's knowledge was an identification of the petitioner and others by the murder victim's brother as an acquaintance of the victim. In *Dunaway* a police detective questioned a jail inmate who was the source of a lead implicating petitioner in an attempted homicide. He learned nothing from the inmate that supplied enough information to get a warrant, but ordered the detectives to pick up the petitioner and bring him in. Unlike this case, in every one of those cases overreaching police conduct was involved, and the arrests were, without question, found to be unconstitutional.

Finally, even if the entire detention of petitioner was considered to be an illegal arrest, the confessions were not automatically inadmissible. Rather, admissibility depends on whether the confessions were tainted by the arrest. In *Brown* the Court articulated certain factors to be considered in determining whether a confession is voluntary, that is, free of the taint of an illegal arrest. The Court stated:

> The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are

not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances ... and, particularly, the purpose and flagrancy of official misconduct are all relevant.

*Id.* 422 U.S. at 603–4, 95 S.Ct. at 2261–2.

Here, it is clear that the first oral statement given at 1300 Beaubien Street was given after proper *Miranda* warnings and that the first oral statement given at the Taylor Police Station was given after a proper *Miranda* warning. It is also clear that the written statement, which was substantially the same as the oral statement given at 1300 Beaubien, was given after proper *Miranda* warnings were afforded the petitioner.[7]

Additionally, approximately eight hours passed from the time petitioner was taken to the Sixteenth Precinct and the first time he confessed in the downtown station, and nearly 20 hours from the time he gave the written confession in the Taylor Police Station to Officer Hastings. Furthermore, the private meeting between petitioner and Smith prior to petitioner's first statement at the Detroit Police Headquarters was an intervening event which helped insure that the statement was in fact made voluntarily. As petitioner testified, he and Smith decided at that time to tell the truth.

7. One of petitioner's other claims of error is that his written confession was obtained also in violation of *Miranda,* and his attorneys were incompetent for not pursuing a pretrial *Walker* hearing, (*People v. Walker,* 374 Mich. 331, 132 N.W.2d 87 (1965)), to determine the voluntariness of this confession. This confession was elicited from petitioner by Officer Hastings at the Taylor Police Station. The record reflects that Hastings read petitioner his *Miranda* rights and petitioner began making an oral confession. The officer stopped him and returned after a few minutes with a stenographer. He reread petitioner his *Miranda* rights so that they would be made a part of the written statement. This time Pillette, when told that an attorney would be appointed for him if he could not afford one, stated that he did want an attorney. Hastings understood this statement to mean that petitioner wanted an attorney appointed for trial. He continued reading petitioner his rights and then asked him if he, in fact, desired to make a statement. Petitioner said yes and gave a twenty-page confession.

The Court has considered this claim and finds it to be without merit for a number of reasons. Petitioner had freely given a highly incriminating statement the night before and was in the process of giving another statement before being cut off so that Hastings could bring in a stenographer. Second, it is difficult to say that petitioner's counsel were incompetent for not pursuing a *Walker* hearing on the *Miranda* issue prior to trial when they did object to the introduction of the written confession during trial because of the possible *Miranda* problem and the judge ruled on their objection. Additionally, the record does not reflect that Pillette at any time indicated that he in fact intended to remain silent until an attorney was present. And finally, even assuming that the confession was obtained in violation of *Miranda,* its introduction at trial was without doubt harmless error because it was substantially similar in content to the highly incriminating oral statement made by Pillette the previous evening, which was elicited after proper *Miranda* warnings and properly introduced at trial.

Finally, if there was any police misconduct here at all, and the Court holds there was not, it certainly was not flagrant. As mentioned earlier, this was not a situation where officers picked up Smith and petitioner on the street and began questioning them in hopes of learning something. Rather, petitioner and Smith subjected themselves to police interrogation as part of their coverup scheme.

It is highly unlikely that petitioner would have prevailed on the merits of his Fourth and Fifth Amendment claims if proper motions had been made. Therefore, it is difficult now to find that trial counsel were incompetent for failing to raise the claims by proper motions in the state court. It is true that an astute criminal defense attorney could have detected a colorable Fourth and Fifth Amendment claim here and filed a suppression motion, but the Court cannot say that petitioner was denied the effective assistance of counsel because counsel did not. As the Court in *Isaac, supra,* pointed out:

> We have long recognized ... that the Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim.

*Id.* 456 U.S. at 134, 102 S.Ct. at 1574.

Furthermore, petitioner's counsel were not incompetent in permitting petitioner to take the witness stand and testify to the same facts already admitted to in the confessions. It apparently was a trial tactic because petitioner was cooperative in making the confessions and consistently denied any sexual contact with the child. He denied sexually assaulting the child during his testimony as well. It may not have been the wisest defense strategy to put petitioner on the stand, but it was a judgment call by petitioner's attorneys, and judgment calls that misfire do not constitute ineffective assistance of counsel. Petitioner's attorneys hoped that at the very least the jury would acquit petitioner on the two first degree sexual conduct charges. The fact that the jury did not believe petitioner and did convict him on those two charges does not indicate ineffective assistance of counsel.

For the reasons given, the petition for habeas corpus is denied. An order may be presented.