## TAYLOR v. ALABAMA

No. 81–5152.   Argued March 23, 1982—Decided June 23, 1982

MARSHALL, J., delivered the opinion of the Court, in which BRENNAN, WHITE, BLACKMUN, and STEVENS, JJ., joined.   O'CONNOR, J., filed a dis-

senting opinion, in which BURGER, C. J., and POWELL and REHNQUIST, JJ., joined, *post*, p. 694.

*Robert M. Beno* argued the cause and filed briefs for petitioner.

*Thomas R. Allison*, Assistant Attorney General of Alabama, argued the cause for respondent. With him on the brief was *Charles A. Graddick*, Attorney General.*

JUSTICE MARSHALL delivered the opinion of the Court.

This case presents the narrow question whether petitioner's confession should have been suppressed as the fruit of an illegal arrest. The Supreme Court of Alabama held that the evidence was properly admitted. Because the decision below is inconsistent with our decisions in *Dunaway* v. *New York*, 442 U. S. 200 (1979), and *Brown* v. *Illinois*, 422 U. S. 590 (1975), we reverse.

I

In 1978, a grocery store in Montgomery, Ala., was robbed. There had been a number of robberies in this area, and the police had initiated an intensive manhunt in an effort to apprehend the robbers. An individual who was at that time incarcerated on unrelated charges told a police officer that "he had heard that [petitioner] Omar Taylor was involved in the robbery." App. 4. This individual had never before given similar information to this officer, did not tell the officer where he had heard this information, and did not provide any details of the crime. This tip was insufficient to give

---

*Arthur F. Mathews* and *James E. Coleman, Jr.*, filed a brief for the American Civil Liberties Union as *amicus curiae* urging reversal.

*Fred E. Inbau, Wayne W. Schmidt, James P. Manak, Patrick F. Healy, William K. Lambie, Richard J. Brzeczek, Frank G. Carrington, Courtney A. Evans, Robert K. Corbin*, Attorney General of Arizona, and *Steven J. Twist*, Chief Assistant Attorney General, *Tyrone C. Fahner*, Attorney General of Illinois, and *Melbourne Noel*, Chief Assistant Attorney General, and *William L. Parker, Jr.*, filed a brief for Americans for Effective Law Enforcement, Inc., et al. as *amici curiae* urging affirmance.

the police probable cause to obtain a warrant or to arrest petitioner.

Nonetheless, on the basis of this information, two officers arrested petitioner without a warrant. They told petitioner that he was being arrested in connection with the grocery-store robbery, searched him, and took him to the station for questioning. Petitioner was given the warnings required by *Miranda* v. *Arizona*, 384 U. S. 436 (1966). At the station, he was fingerprinted, readvised of his *Miranda* rights, questioned, and placed in a lineup. The victims of the robbery were unable to identify him in the lineup. The police told petitioner that his fingerprints matched those on some grocery items that had been handled by one of the participants in the robbery. After a short visit with his girlfriend and a male companion, petitioner signed a waiver-of-rights form and executed a written confession. The form and the signed confession were admitted into evidence.

Petitioner objected to the admission of this evidence at his trial. He argued that his warrantless arrest was not supported by probable cause, that he had been involuntarily transported to the police station, and that the confession must be suppressed as the fruit of this illegal arrest. The trial court overruled this objection, and petitioner was convicted. On appeal, the Alabama Court of Criminal Appeals reversed, 399 So. 2d 875 (1980), holding that the facts of this case are virtually indistinguishable from those presented to this Court in *Dunaway* v. *New York*, *supra*, and that the confession should not have been admitted into evidence. The Alabama Supreme Court reversed the Court of Criminal Appeals, 399 So. 2d 881 (1981), and we granted certiorari, 454 U. S. 963 (1981).

## II

In *Brown* v. *Illinois*, *supra*, and *Dunaway* v. *New York*, *supra*, the police arrested suspects without probable cause. The suspects were transported to police headquarters, advised of their *Miranda* rights, and interrogated. They con-

fessed within two hours of their arrest. This Court held that the confessions were not admissible at trial, reasoning that a confession obtained through custodial interrogation after an illegal arrest should be excluded unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is "'sufficiently an act of free will to purge the primary taint.'" *Brown* v. *Illinois, supra,* at 602 (quoting *Wong Sun* v. *United States,* 371 U. S. 471, 486 (1963)). See also *Dunaway* v. *New York, supra,* at 217. This Court identified several factors that should be considered in determining whether a confession has been purged of the taint of the illegal arrest: "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, . . . and, particularly, the purpose and flagrancy of the official misconduct." *Brown* v. *Illinois, supra,* at 603–604 (citations and footnote omitted); *Dunaway* v. *New York,* 442 U. S., at 218. The State bears the burden of proving that a confession is admissible. *Ibid.*

In *Brown* and *Dunaway,* this Court firmly established that the fact that the confession may be "voluntary" for purposes of the Fifth Amendment, in the sense that *Miranda* warnings were given and understood, is not by itself sufficient to purge the taint of the illegal arrest. In this situation, a finding of "voluntariness" for purposes of the Fifth Amendment is merely a threshold requirement for Fourth Amendment analysis. See *Dunaway* v. *New York, supra,* at 217. The reason for this approach is clear: "[t]he exclusionary rule, . . . when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth" Amendment. *Brown* v. *Illinois,* 422 U. S., at 601. If *Miranda* warnings were viewed as a talisman that cured all Fourth Amendment violations, then the constitutional guarantee against unlawful searches and seizures would be reduced to a mere "'form of words.'" *Id.,* at 603 (quoting *Mapp* v. *Ohio,* 367 U. S. 643, 648 (1961)).

This case is a virtual replica of both *Brown* and *Dunaway.*

Petitioner was arrested without probable cause in the hope that something would turn up, and he confessed shortly thereafter without any meaningful intervening event. The State's arguments to the contrary are unpersuasive. The State begins by focusing on the temporal proximity of the arrest and the confession. It observes that the length of time between the illegal arrest and the confession was six hours in this case, while in *Brown* and *Dunaway* the incriminating statements were obtained within two hours. However, a difference of a few hours is not significant where, as here, petitioner was in police custody, unrepresented by counsel, and he was questioned on several occasions, fingerprinted, and subjected to a lineup. The State has not even demonstrated the amount of this time that was spent in interrogation, arguing only that petitioner "had every opportunity to consider his situation, to organize his thoughts, to contemplate his constitutional rights, and to exercise his free will." Brief for Respondent 11.

The State points to several intervening events that it argues are sufficient to break the connection between the illegal arrest and petitioner's confession. It observes that petitioner was given *Miranda* warnings three times. As our foregoing discussion of *Brown* and *Dunaway* demonstrates, however, the State's reliance on the giving of *Miranda* warnings is misplaced. The State also observes that petitioner visited with his girlfriend and a male companion before he confessed. This claim fares no better. According to the officer and petitioner, these two visitors were outside the interrogation room where petitioner was being questioned. After petitioner signed a waiver-of-rights form, he was allowed to meet with these visitors. The State fails to explain how this 5- to 10-minute visit, after which petitioner immediately recanted his former statements that he knew nothing about the robbery and signed the confession, could possibly have contributed to his ability to consider carefully and objectively his options and to exercise his free will. This sugges-

tion is particularly dubious in light of petitioner's uncontroverted testimony that his girlfriend was emotionally upset at the time of this visit.[1]   If any inference could be drawn, it would be that this visit had just the opposite effect.

The State points to an arrest warrant filed after petitioner had been arrested and while he was being interrogated as another significant "intervening event."   While petitioner was in custody, the police determined that the fingerprints on some grocery items matched those that they had taken from petitioner immediately after his arrest.   Based on this comparison, an arrest warrant was filed.   The filing of this warrant, however, is irrelevant to whether the confession was the fruit of the illegal arrest.   This case is not like *Johnson v. Louisiana*, 406 U. S. 356 (1972), where the defendant was brought before a committing Magistrate who advised him of his rights and set bail.   Here, the arrest warrant was filed *ex parte*, based on the comparison of the fingerprints found at the scene of the crime and petitioner's fingerprints, which had been taken immediately after his arrest.   The initial fin-

---

[1] According to petitioner, his girlfriend became upset upon hearing the officer advise petitioner to cooperate.   App. 16.   Contrary to the allegations in the dissent, at no point did the officer contradict petitioner's version of his girlfriend's emotional state or petitioner's statement that his girlfriend was present at the time the officer advised him to cooperate.   In fact, the testimony from both petitioner and the officer with respect to this visit are consistent.   The officer testified only that he advised petitioner to cooperate between the time petitioner signed a rights form at the commencement of this interrogation period and the time that petitioner signed the statement of confession.   Tr. 31, 136–137.   He also testified that during this same interval, he allowed the short visit between petitioner and his girlfriend.   *Ibid.*   The District Court made no findings of fact with respect to these incidents.   In any event, even assuming the accuracy of the dissent's version of the facts, compare *post*, at 695, and n. 2, with Tr. 31, 136–137, the dissent offers no explanation for its conclusion that this 5- to 10-minute visit should be viewed as an intervening event that purges the taint of the illegal arrest.

gerprints, which were themselves the fruit of petitioner's illegal arrest, see *Davis* v. *Mississippi*, 394 U. S. 721 (1969), and which were used to extract the confession from petitioner, cannot be deemed sufficient "attenuation" to break the connection between the illegal arrest and the confession merely because they also formed the basis for an arrest warrant that was filed while petitioner was being interrogated.[2]

Finally, the State argues that the police conduct here was not flagrant or purposeful, and that we should not follow our decisions in *Brown* and *Dunaway* for that reason. However, we fail to see any relevant distinction between the conduct here and that in *Dunaway*. In this case, as in *Dunaway*, the police effectuated an investigatory arrest without probable cause, based on an uncorroborated informant's tip, and involuntarily transported petitioner to the station for interrogation in the hope that something would turn up. The fact that the police did not physically abuse petitioner, or that the confession they obtained may have been "voluntary" for purposes of the Fifth Amendment, does not cure the illegality of the initial arrest. Alternatively, the State contends that the police conduct here argues for adopting a "good faith" exception to the exclusionary rule. To date, we have not recognized such an exception, and we decline to do so here.

---

[2] Petitioner also raises an ambiguous objection to the admission of fingerprint evidence at his trial. The trial court granted petitioner's motion to suppress the initial fingerprints as the fruit of his illegal arrest under *Davis* v. *Mississippi*, 394 U. S. 721 (1969), and granted the State's motion to take petitioner's fingerprints at trial. The nature of petitioner's objection to the admission of any fingerprint evidence at trial is unclear, and it is also uncertain whether an objection to the procedure used for taking the second set of fingerprints has been properly preserved for our review. In any event, we need not reach this issue because we reverse the decision on the ground that the confession should not have been admitted. To the extent that petitioner still may challenge the fingerprinting procedure employed below, the state courts should be given the opportunity to address this challenge in the first instance.

## III

In sum, petitioner's confession was the fruit of his illegal arrest. Under our decisions in *Brown* v. *Illinois* and *Dunaway* v. *New York*, the confession clearly should not have been admitted at his trial. Accordingly, we reverse the decision of the Alabama Supreme Court and remand this case for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE, JUSTICE POWELL, and JUSTICE REHNQUIST join, dissenting.

The Court holds today that Omar Taylor's detailed confession was the fruit of an illegal arrest, and consequently, should be suppressed. Because I conclude that neither the facts nor the law supports the Court's analysis, I respectfully dissent.

## I

In the course of their investigation of the Moseley robbery, Montgomery police questioned Charles Martin, who was being held on unrelated rape and robbery charges. Martin stated that "he had heard that Omar Taylor was involved in the robbery of Moseley's Grocery," Tr. 6, but the police made no attempt to establish either Martin's credibility as an informant or the reliability of the information he provided.[1]

Based only on this tip, which did not provide probable cause, Sergeants Alford and Rutland arrested Taylor a little before 3 p.m. on January 4, 1979. At that time, they told him why he was being arrested and advised him of his *Miranda* rights, but asked him no questions regarding the robbery. Tr. 20, 24. When they arrived at the police station, the officers turned Taylor over to detectives.

After Taylor had been fingerprinted and signed a form

---

[1] The police, however, suspected Martin of complicity in the Moseley robbery, Tr. 15. It later developed that Martin had instigated, planned, and participated in the robbery.

acknowledging his *Miranda* rights, Detective Wilson questioned him for about 15 minutes, Tr. 48, and placed him in a lineup before one of the victims, Mrs. Moseley. *Id.*, at 37–38. At the lineup, which lasted about an hour, *id.*, at 48, Mrs. Moseley was unable to identify the petitioner. Following the lineup, Detective Wilson told Taylor that his fingerprints matched the fingerprints removed from grocery items handled by one of the robbers. Nevertheless, the petitioner denied knowledge of the robbery.

Toward 9 p.m. that evening, Detective Hicks readvised Taylor of his *Miranda* rights, Tr. 25, and Taylor once again read and signed a form setting forth his *Miranda* rights. Tr. 28, 125. At no time did Taylor ask for a lawyer or indicate that he did not want to talk to police. *Id.*, at 28–29, 35, 40. During his 5- to 10-minute interview with Taylor, Detective Hicks confronted him with the fingerprint evidence. *Id.*, at 36. Hicks urged the petitioner to cooperate with the police, but carefully refrained from making him any promises, stating that at most he could inform the judge of the petitioner's cooperation. *Id.*, at 31, 34. Taylor continued to deny involvement in the robbery. *Id.*, at 35–36.

Following this conversation, both the petitioner's girlfriend and his neighbor came to the police station and requested to speak with him. When Taylor indicated that he wanted to speak with his friends, Detective Hicks left them alone in his office for several minutes.[2] After that meeting,

---

[2] The Court's rather different account of this meeting apparently stems from a decision to accept the testimony most favorable to the holding it wants to reach. That decision, however, runs counter to the longstanding practice of federal appellate courts to uphold the denial of the motion to suppress if, in the absence of any express findings by the district court, there is any reasonable view of the evidence to support it. See *United States* v. *Payton*, 615 F. 2d 922, 923 (CA1), cert. denied, 446 U. S. 969 (1980); *United States* v. *Vicknair*, 610 F. 2d 372, 376, n. 4 (CA5), cert. denied, 449 U. S. 823 (1980). In the present case, the officer testified that Taylor's "girlfriend came to us and said she wanted to talk to Omar, and we told Omar she was outside and he wanted to talk to her. And at that time, we let him talk to her." Tr. 35. Detective Hicks specifically denied that

the petitioner confessed to the crime, and signed a detailed written confession.[3]

Before trial, the petitioner moved to suppress his confes-

---

he had urged Taylor to talk to his girlfriend. *Id.*, at 35, 133–134. The detective acknowledged that he had told the petitioner that he could inform the judge of the petitioner's cooperation, but he expressly denied making any other statements to Taylor or his girlfriend about "cooperation." *Id.*, at 31, 134.

The petitioner, of course, had a vastly different version. He testified that the police had brought his girlfriend into the room and told him, in her presence, that he was facing 10 years to life in prison, but that if he cooperated they might be able to arrange a suspended sentence or probation. Upon hearing that remark, the petitioner's girlfriend became upset and began to cry, at which point the police left the petitioner alone with his friends. *Id.*, at 52. As we noted above, the police expressly denied making any such statements. More importantly, upon comparing the two versions, it becomes clear that in an effort to support its holding, the Court has parsed through the petitioner's story and plucked those tidbits that the police did not expressly contradict. This method of setting forth the facts of a case on appellate review hardly comports with the rule that an appellate court must adopt any reasonable view of the evidence that supports the trial court's ruling.

Since there is nothing unreasonable about the police account of the meeting between the petitioner and his friends, that version is the one we must accept on review. At the hearing, Detective Hicks testified that after Taylor asked to speak with his friends, the police left them alone together. There is no suggestion, other than the petitioner's discredited version of the meeting, that the police said anything to the petitioner's girlfriend, or that she became upset. Thus, the Court errs in stating that the petitioner's girlfriend became upset because of statements made by the police, and in intimating that the police created a coercive atmosphere in which the petitioner could not carefully consider his options and, on the basis of his friends' advice, decide to confess to the robbery.

[3] In that confession, the petitioner stated that Charles Martin approached him with guns and a plan to rob Moseley's Grocery. Taylor's role in the robbery was to distract Mr. Moseley by buying some groceries. Just before his accomplices pulled out their guns, Taylor put down the groceries and walked outside to see whether an approaching car was a police car. When he saw that it was not a police car, he began to reenter the store, but stopped when he saw the robbery taking place. Thereafter he fled, met his cofelons at a preassigned place, and took his share of the money. *Id.*, at 128–132.

sion, arguing that it was the product of an illegal arrest, and that it had been obtained in violation of his Fifth and Sixth Amendment rights. The trial judge assumed that the arrest was illegal,[4] but found that the confession was voluntary, consistent with the Fifth and Sixth Amendments, and that "there were enough intervening factors between the arrest and confession" to overcome the taint of the illegal arrest. *Id.*, at 116. Accordingly, he admitted the confession.

## II

Although the Court misapprehends the facts of the present case, it has stated correctly the controlling substantive law. In the Court's words, "a confession obtained through custodial interrogation after an illegal arrest should be excluded unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is 'sufficiently an act of free will to purge the primary taint.'" *Ante*, at 690 (quoting *Brown* v. *Illinois*, 422 U. S. 590, 602 (1975)).

In *Brown*, this Court emphasized that "*Miranda* warnings are an important factor . . . in determining whether the confession [was] obtained by exploitation of an illegal arrest." *Id.*, at 603.[5] The Court did not discount the significance

---

[4] In fact, the State did not seriously contend that the arrest had been based on probable cause. See *id.*, at 8, 10.

[5] The holding in *Brown* was derived from this Court's seminal decision in *Wong Sun* v. *United States*, 371 U. S. 471 (1963), in which we rejected a "but for" test for determining whether to suppress evidence gathered following a Fourth Amendment violation.

"We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959)." *Id.*, at 487–488.

of other factors, however, noting that *"Miranda* warnings, *alone* and *per se,* cannot always make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession." *Ibid.* *Brown* holds, therefore, that not only *Miranda* warnings, but also "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant." *Id.,* at 603–604 (footnotes and citations omitted).

In light of those factors, the *Brown* Court reviewed the record and found that "Brown's first statement was separated from his illegal arrest by less than two hours, and [that] there was no intervening event of significance whatsoever." *Id.,* at 604. Moreover, the police conduct in arresting Brown was particularly egregious. The "impropriety of the arrest was obvious," and the "manner in which Brown's arrest was effected gives the appearance of having been calculated to cause surprise, fright, and confusion." *Id.,* at 605. The Court held that as a consequence the confession should have been suppressed.

Four Terms later, in *Dunaway* v. *New York,* 442 U. S. 200, 204 (1979), this Court reaffirmed the *Brown* rule that in order to use at trial statements obtained following an arrest on less than probable cause

> "the prosecution must show not only that the statements meet the Fifth Amendment voluntariness standard, but also that the causal connection between the statements and the illegal arrest is broken sufficiently to purge the primary taint of the illegal arrest."

Finding the facts in *Dunaway* to be "virtually a replica of the situation in *Brown," id.,* at 218, the Court held that the petitioner's confession should have been suppressed. Critical to the Court's holding was its observation that the petitioner

"confessed without any intervening event of significance."
*Ibid.* See *id.*, at 219 ("No intervening events broke the
connection between petitioner's illegal detention and his
confession").

### III

Our task is to apply the law as articulated in *Brown* and
*Dunaway* to the facts of this case.

The first significant consideration is that following his un-
lawful arrest, Taylor was warned on three separate occasions
that he

> "had a right to remain silent, [and] anything he said
> could be used against him in a court of law[;] he had the
> right to have an attorney present, [and] if he could not
> afford one, the State would appoint one for him[;] he
> could answer questions but he could stop answering at
> any time." Tr. 23.

Under *Brown* and *Dunaway*, these warnings must be
counted as "an important factor . . . in determining whether
the confession [was] obtained by exploitation of an illegal ar-
rest," *Brown* v. *Illinois, supra*, at 603, though they are,
standing alone, insufficient to prove that the primary taint of
an illegal arrest had been purged.

Second, in contrast to the facts in *Brown*, the facts in the
present case show that the petitioner was not subjected to
intimidating police misconduct. In *Brown*, police had bro-
ken into the petitioner's house and searched it. When the
petitioner later came home, two officers pointed their guns at
him and arrested him, leading the Court to conclude that
"[t]he manner in which [the petitioner's] arrest was effected
gives the appearance of having been calculated to cause sur-
prise, fright, and confusion." 422 U. S., at 605. By con-
trast, nothing in the record before us indicates that the peti-
tioner's arrest was violent, or designed to "cause surprise,
fright, and confusion." Instead, Montgomery officers ap-

proached Taylor, asked him his name, and told him that he was under arrest for the Moseley robbery. They then searched him, advised him of his rights, and took him to the police station.

Third, while in both *Brown* and *Dunaway* there was "no intervening event of significance whatsoever," 422 U. S., at 604, in the present case Taylor's girlfriend and neighbor came to the police station and asked to speak with him. Before meeting with his two friends, the petitioner steadfastly had denied involvement in the Moseley robbery. Immediately following the meeting, the petitioner gave a complete and detailed confession of his participation in the armed robbery. This meeting between the petitioner and his two friends, as described by the police in their testimony at the suppression hearing, plainly constituted an intervening circumstance.

Finally, the record reveals that the petitioner spent most of the time between his arrest and confession by himself.[6] In *Dunaway* and *Brown*, by contrast, the defendants were interrogated continuously before they made incriminating statements.

In sum, when these four factors are considered together,[7] it is obvious that there is no sufficient basis on which to overturn the trial court's finding that "there were enough intervening factors" to overcome the taint of the illegal arrest. In fact, I believe it is clear that the State carried its burden of proof. The petitioner was warned of his rights to remain si-

---

[6] The petitioner confessed some six hours after his arrest. As JUSTICE STEVENS noted in his concurring opinion in *Dunaway*, the "temporal relationship between the arrest and the confession may be an ambiguous factor," 442 U. S., at 220, for a lengthy detention could be used to exploit an illegal arrest at least as easily as a brief detention. In the present case, there seems to be nothing remarkable, one way or the other, about the length of detention.

[7] The Court has taken each circumstance out of context and examined it to see whether it alone would be enough to purge the taint of the illegal arrest. The Court's failure to consider the circumstances of this case as a whole may have contributed to its erroneous conclusion.

lent and to have a lawyer present, and there is no dispute that he understood those rights or that he waived them voluntarily and without coercion. After receiving three sets of such warnings, he met with his girlfriend and neighbor, *at his request*. Following that meeting, at which no police officers were present, the petitioner decided to confess to his participation in the robbery. The petitioner's confession was not proximately caused by his illegal arrest, but was the product of a decision based both on knowledge of his constitutional rights and on the discussion with his friends. Accordingly, I respectfully dissent.