459 So.2d 246 (1984)
Margie Diann LOCKETT
v.
STATE of Mississippi.
No. 54431.
Supreme Court of Mississippi.
October 3, 1984.
Rehearing Denied December 5, 1984.
*247 Thomas M. Fortner, Pascagoula, for appellant.
Bill Allain, Atty. Gen. by Walter L. Turner, Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
DAN M. LEE, Justice, for the Court:
This is an appeal from the Circuit Court of Jackson County, wherein the appellant, Margie Diann Lockett was found guilty of the murder of Luke Broderick. Ms. Lockett was indicted for capital murder with the underlying felony of armed robbery. The jury returned a verdict of murder and she was sentenced to life imprisonment in the custody of the Mississippi Department of Corrections. From her conviction and sentence, *248 she brings this appeal and assigns as error:
1. That the Court erred in overruling Defendant's motion to suppress her pre-trial statements made to law enforcement officers for the reason that said statements followed immediately an illegal arrest in violation of Defendant's Fourth Amendment guarantees, and said statements were not separated from the initial illegality by any attenuating circumstances which might make them admissible.
2. That the Court erred in overruling Defendant's motion to suppress her pre-trial statements made to law enforcement officers for the reason that said statements were made in violation of Defendant's Fifth and Sixth Amendment rights.
3. That the Court erred in overruling Defendant's motion to delete from her pre-trial statement to law enforcement officers all references to acts of prostitution by Defendant, said references being evidence of other crimes of Defendant and therefore inadmissible.
The only facts necessary for a resolution of this appeal are those surrounding the pair of statements Ms. Lockett gave to authorities. As she has not assigned any error regarding the weight of the evidence, the proof at trial as to how the shooting occurred is not particularly significant for purposes of this appeal. It is sufficient to state that Luke Broderick owned a bar called "Luke's Angle Inn." On September 9, 1981, Ms. Lockett called Broderick and asked to borrow some money. He told her that he would lend her the money and for her to come to his bar. She arrived late in the evening and stayed until he closed the bar at approximately 1:30 a.m. At that time he cleaned up the bar and the two of them went into a back room where he kept a bed and had sex. At some point Broderick loaned Ms. Lockett $40. She testified that the loan was not in payment for the sex. Thereafter the two of them got into an argument and Ms. Lockett used Broderick's gun to shoot him five times. She then ran out of the bar naked with the gun and Broderick's cash box containing $437.25.
Ms. Lockett was arrested for auto theft on November 24, 1981 by the Hernando County Sheriff's Department in Florida. The Ocean Springs Police Department received word that Ms. Lockett was being held in Florida and they sent two officers with an arrest warrant to interrogate her and bring her back to Ocean Springs.
During a hearing on Ms. Lockett's motion to suppress her two statements, Kevin Alves, the Chief of Detectives of Ocean Springs Police Department, testified that he and Captain Mulvaney, also of the Ocean Springs Police Department, journeyed to Florida to interrogate Ms. Lockett. Alves testified that he and Mulvaney took with them an arrest warrant signed by Ann Bridges, a desk sergeant and dispatcher for the Ocean Springs Police Department.
Alves testified that he and Mulvaney advised Ms. Lockett of her Miranda[1] rights as soon as they came into the interrogation room. "Moments" later, before taking any statement, they served her with the arrest warrant signed by Ann Bridges. Ms. Lockett was then presented with a written form entitled "Waiver of Rights" which she read herself and then she and Alves read together. According to Alves she stated that she had no questions regarding her rights and then signed the waiver. Detective Alves stated that no threats or promises were made to induce the subsequent statement. At that point a rather lengthy statement in question and answer form was given by Ms. Lockett. At Ms. Lockett's request that statement was tape-recorded so that she could be sure that there were no alterations to it.
That afternoon only a short time after the first statement was concluded, Ms. Lockett was again advised of her rights, signed a second waiver of those rights and at her request, gave a handwritten statement to Officers Alves and Mulvaney. Officer *249 Alves testified that there were no threats made against Ms. Lockett to induce this second statement. Officer Alves did testify that he and Officer Mulvaney explained to Ms. Lockett that she was wanted for a capital offense and that it carried the death penalty. This explanation was given to her after the first statement and before the second.
Captain Mulvaney testified that he was present during the entire interrogation of Ms. Lockett except for brief periods when he left the room to get Cokes and cigarettes. He stated that the charge of capital murder was mentioned to Ms. Lockett after she concluded her first statement; however, that charge was never used as a threat to make her continue talking. He denied that he and Officer Alves had used any coercion to get Ms. Lockett to sign the waivers of rights or to give her statements.
Ms. Lockett testified that between the taped statement and the written statement, the officers told her they were going to charge her with capital murder because her taped statement gave them nothing else to go on. She stated that she understood Officer Mulvaney to say that he was going to charge her with capital murder unless she gave a second statement. She admitted that he did not use those words and later changed her mind and said that it was Officer Alves who told her that. Ms. Lockett testified that she understood that if she gave a second statement "then they could possibly drop it."
Ms. Lockett further testified that no threats were made against her and that she understood her Miranda rights as read to her. She stated that in between her statement she was trying to question Alves and Mulvaney about the capital murder charge because she didn't know that Broderick was dead. She again stated that no threats or promises had been made to induce her second statement.
Following the taking of the above detailed testimony, the trial judge determined that Ms. Lockett's statements were the results of knowing and intelligent waivers of her right against self-incrimination and further that the arrest warrant signed by the Ocean Springs Police Department Desk Sergeant did not render them inadmissible.
Ms. Lockett's first assignment of error is that the trial court erred in overruling her motion to suppress her pre-trial statement because they were results of an illegal arrest based on an invalid arrest warrant. Ms. Lockett's argument is founded in the Fourth Amendment which is applicable to the states by way of the Fourteenth Amendment. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 84 A.L.R.2d 933 (1961).
The state does not seriously argue that the arrest warrant signed by Sgt. Bridges was valid even though she purported to be signing for Municipal Court Judge Russell Reed. Indeed, under the guidelines the United States Supreme Court has set down in Shadwick v. City of Tampa, 407 U.S. 345, 92 S.Ct. 2119, 32 L.Ed.2d 783 (1972), someone independent of the police and prosecution must determine probable cause. To quote the Court: "Whatever else neutrality and detachment might entail, it is clear that they require severance and disengagement from activities of law enforcement." 407 U.S. at 350, 92 S.Ct. at 2123, 32 L.Ed.2d at 789.
This Court is firmly of the opinion that a police dispatcher and desk sergeant is not sufficiently severed from the activities of law enforcement nor independent of the police and prosecution so as to be considered a neutral and detached magistrate. Undoubtedly, the arrest warrant was invalid. The crux of this assignment of error is whether the invalid arrest warrant served on Ms. Lockett when she was already in custody under a valid arrest so tainted her statements as to render them inadmissible. The state argues that this arrest warrant was mere surplusage and therefore cannot be termed reversible error. Ms. Lockett argues that while the invalid warrant may have been unnecessary, it was in fact served on her and therefore her statement was a result of being served with that invalid warrant.
*250 In Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), the United States Supreme Court held that the giving of Miranda warnings does not alone break the causal connection between an illegal arrest and a confession thereafter obtained. The Court said:
Any incentive to avoid Fourth Amendment violations would be eviscerated by making the warnings, in effect, a "cure all," and the Constitutional guarantee against unlawful searches and seizures could be said to be reduced to "a form of words."
422 U.S. at 602, 603, 95 S.Ct. at 2261, 45 L.Ed.2d at 426.
The Court in Brown then set forth several factors which it regarded as critical to determining whether a confession obtained by an illegal arrest was the product of free will. Those factors are: (1) The giving of Miranda warnings. (2) The temporal proximity of the arrest and the confession. (3) The presence of intervening circumstances. (4) The purpose and flagrancy of the official misconduct. (5) Any other circumstances that seem relevant. The United States Supreme Court repeated these factors in Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) and Taylor v. Alabama, 457 U.S. 687, 102 U.S. 2664, 73 L.Ed.2d 314 (1982). In Hall v. State, 427 So.2d 957 (Miss. 1983), this Court has had occasion to recognize and apply the holding in Brown.
Even after applying these factors to the instant case an obvious solution does not present itself. Ms. Lockett does not deny that she received the Miranda warnings. Her rearrest on the invalid warrant and her first statement occurred just moments apart. Her second statement was given less than two hours after the completion of the first. The degree of flagrancy of the officers' misconduct should not be understated. A police captain and the chief of detectives should certainly have been aware that a police dispatcher and desk sergeant could not serve as a neutral and detached magistrate so as to sign an arrest warrant.
With the above factors weighing against the admissibility of the statement, there is still the question whether the original arrest neutralized the invalidity of the second arrest. Certainly had the Florida authorities simply received word that Ms. Lockett was a suspect in a Mississippi murder, there would have been no error committed had they questioned her regarding that information.
In Neal v. State, 451 So.2d 743 (Miss. 1984), Neal was the subject of a lawful arrest in California on a charge of shoplifting. During his detention he gave statements that implicated him in a murder which occurred in Mississippi. Neal argued that those statements were inadmissible because of the failure of the California authorities to take him before a judicial officer for a probable cause determination following his rearrest on the murder charges. In addressing Neal's argument, we held:
The point is spurious. The arrest of Neal on the shoplifting charge was wholly lawful. He was advised repeatedly of his privilege against self-incrimination and of his right to counsel. In the end he knowingly and voluntarily waived those rights. Repeated Miranda warnings coupled with the passage of enough time to allow an accused to become acclimated to his surroundings followed thereafter by a voluntary waiver are generally more than sufficient to remove from a subsequent confession the taint, if any, of delay in taking the accused before a committing magistrate. See Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); Hall v. State, 427 So.2d 957 (Miss. 1983).
451 So.2d at 757.
We are of the opinion that because Ms. Lockett was already the subject of a valid arrest by Florida authorities on a completely separate charge, the invalidity of the arrest warrant served by Officers Alves and Mulvaney becomes irrelevant. If Ms. Lockett was prejudiced that prejudice arose as a result of duress or intimidation by being arrested on a charge of capital murder. *251 Because these factors relate to the voluntariness of her statement, the basis of Ms. Lockett's second assignment of error, they will be discussed together.
Under her second assignment of error Ms. Lockett makes two arguments as to why her statements were products of violations of the Fifth Amendment. First, she argues that her waiver of rights was not knowing and intelligent. Certainly this Court and the United States Supreme Court have frequently addressed this issue and said that a waiver of the Fifth Amendment privilege against self-incrimination must be both knowing and intelligent. North Carolina v. Butler, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); Neal v. State, supra.
Ms. Lockett's argument that her waiver of rights was not knowing and intelligent partially stems from the following exchange between her and Officer Alves at the beginning of her first statement:
BY OFFICER ALVES:
Today's date is November 24th, 1981. The time is 11:40 a.m., interview being conducted with Mrs. Margie Diane (sic) Lockett. It will be conducted at the Hernando County Sheriff's Office in Florida. Those present are myself, Detective Captain Kevin Alves, and Detective Captain George Mulvaney of the Ocean Springs Police Department. The first statement on the list here is by myself. Mrs. Lockett, at this time I'd like to advise you again of your constitutional rights which we have already done once, but I'd like to go over them once more. Before we ask you any questions you must understand your rights. You have the right to remain silent, anything you say can be used against you in Court. You have the right to talk to a lawyer for advice before we ask you any questions and have him with you during questioning. If you cannot afford a lawyer one will be appointed for you before any questioning if you wish. If you decide to answer questions now without a lawyer present with you, you will still have the right to stop answering at any time and you also have the right to stop answering at any time until you talk to a lawyer. Mrs. Lockett, what that means is that you've indicated to us that you want to talk to us about the incident that happened in the Angle Inn on September the 7th, (sic) '81 in Ocean Springs. What these rights basically mean is that you have elected to talk to us and answer the questions, but at any time during this interview you can stop. In other words, you don't have to say any more. Do you understand that?
Mrs. Lockett: I understand, but I don't understand if I should have a lawyer or not.
Myself: Okay. Well that's strictly up to you, but like I said, you can stop answering at any time. If you say three words and then you don't want to say anything else, you can stop. So it's strictly up to you, you can play it by ear if you wish. And you've also indicated that you wanted this conversation tape recorded so nobody can change anything.
Mrs. Lockett: Right.
Myself: Okay.
Mrs. Lockett: The conversation that we do have, I do want on tape.
(R. 317, 318)
Ms. Lockett contends that the above exchange demonstrates that her waiver of her right to an attorney was not knowingly and intelligently made. We address this contention by further quoting some of Ms. Lockett's testimony during the suppression hearing wherein she states that she fully understood her rights. That part of her testimony is as follows:
A They asked me did I understand the papers that I read.
Q Did you read it?
A Yes sir.
Q All right. Now can you read this last statement down here just above your signature?
A Yes sir.
Q What does that say?
A I have read this statement of my rights and I understand what my rights are. I am willing to make a statement *252 and answer questions. I do not want a lawyer at this time. I understand what I am doing. No promise or threats have been made to me or no pressure or correction of any kind has been used against me.
Q And I believe that word was coercion. Do you understand what coercion is?
A No sir.
Q You don't understand what coercion is? Do you understand what pressure is?
A Yes sir.
Q All right. Now you read this right here, didn't you?
A Yes.
Q And you signed it right here, didn't you?
A Uh-huh.
Q And do you understand what that says?
A Yes sir.
Q All right, tell the Court what that says. Not reading it. Just explain to the Court what that says.
A It means that I give up my right to a lawyer.
Q All right, and what else?
A And that they haven't threatened me or promised me anything.
Q All right, anything else?
A And anything that I say can be used against me.
Q All right, that's up here, isn't it?
A Uh-huh.
Q You understand that part too.
A Yes sir.
Q Can you read this part here, do you understand this? It says I understand what my rights are?
A Yes sir.
Q Okay, you understood this when you read it and signed it?
A Yes sir.
Q All right, now at that time did they hit you or beat up on you or use any kind of physical pressure on you?
A No sir.
Q Did they use any kind of psychological pressure or coercion on you? You say you don't understand what coercion is, right?
A Uh-huh.
Q All right, did they threaten you or pressure you in any way to get you to execute this?
A No sir.
(R. 100, 101)
Based on the above excerpts from the record, we are of the opinion that Ms. Lockett's first waiver of her rights was knowing and intelligent. Although she may not have been able to decide whether she wanted an attorney, the record is clear that she understood that she had the right to one. It is not the responsibility of police officers to decide for an accused whether the accused should retain an attorney. It is sufficient that the accused understand that the retention of counsel is a viable option.
Ms. Lockett next argues that her second statement was the result of coercion on the part of Officers Alves and Mulvaney. She takes the position that she only gave the second statement because they threatened her with a charge of capital murder if she did not. Both Alves and Mulvaney admit explaining to Ms. Lockett what capital murder was and the fact that it carried with it the death penalty in between her taped statement and her written statement. Both of them however, denied that the charge of capital murder was used as a threat to make her continue talking. In her testimony, Ms. Lockett agrees and states that no threats or promises were made to induce the second statement. She then states that it was her understanding that if she gave the written statement "then they could possibly drop it." She later stated that although Officer Mulvaney did not expressly state that he would charge her with capital murder unless she gave the second statement, that was her understanding. Subsequently she changed her story to say that it was Detective Alves and not Mulvaney whom she understood to *253 threaten her with a charge of capital murder.
Based on Ms. Lockett's testimony and that of Officers Alves and Mulvaney this Court is of the opinion that the trial court was correct in ruling that Ms. Lockett's second statement was freely and voluntarily made.
Did the invalid arrest warrant serve as duress or coercion to force either of these statements? Mrs. Lockett testified that at the time she gave her first statement she did not believe that Luke Broderick was dead. She testified that in between the two statements she was trying to question the officers about the capital murder charge because of her disbelief that Broderick was dead. Ms. Lockett said that once she decided that Broderick was really dead, she decided to give the second statement to clear up what she knew were factual inconsistencies in the first statement. Therefore, because she did not believe Broderick was dead at the time she gave her first statement, a capital murder arrest warrant would most likely not have served as a form of coercion. Ms. Lockett admits that it was her knowledge that Broderick was dead that made her want to give the second statement because she knew the first contained a number of falsities. Therefore, this Court is of the opinion that it was not the invalid arrest warrant that coerced Ms. Lockett into making the second statement, but rather, it was the knowledge that she had told a number of lies in her first statement that could be used against her in a trial on a charge of murder.
Ms. Lockett's final assignment of error is that the trial court erred by failing to delete references to prostitution in her first statement. These acts of prostitution referred to in Ms. Lockett's statement all occurred after the shooting. In her first statement, Ms. Lockett testified that following the shooting she worked as a prostitute at truck stops to earn her way to Florida. The trial court overruled her motions to delete these references to prostitution from her statement on the ground that her defense was that she and Broderick got into a fight because he wanted her to work as a prostitute in his bar. The court ruled that her subsequent acts of prostitution were relevant to whether she would have been inflamed by Broderick's request that she work as a prostitute.
The law in Mississippi is well settled that proof of other crimes is inadmissible except where (1) the offense charged and that offered to be proved are so connected as to constitute one transaction, or (2) where it is necessary to identify the defendant or (3) where it is material to prove motive and there is an apparent connection or relation between the act proposed to be proved and that charged, or (4) where the accusation involves a series of criminal acts which must be proved to make out the offense, or (5) where it is necessary to prove scienter or guilty knowledge. Gray v. State, 351 So.2d 1342 (Miss. 1977); Sumrall v. State, 257 So.2d 853 (Miss. 1972).
The parties agree that the Gray and Sumrall cases establish the legal parameters of proof of distinct crimes. The only dispute is their application to the facts in this case. We are of the opinion that the trial court erred in failing to delete references to acts of prostitution by the defendant which occurred subsequent to the shooting. Ms. Lockett's willingness to engage in prostitution as a means to support herself as she fled from the events in Ocean Springs are not relevant to her state of mind concerning willingness to engage in prostitution before the shooting. Certainly they are not indicative to her willingness to work as a prostitute for Luke Broderick nor to her claim that the disagreement led to her being forced to defend herself. There is no formula or calculation capable of determining the willingness of a desperate, fleeing individual to commit acts which under normal free circumstances that person would not commit. We are of the opinion that the admission of the statements of Ms. Lockett's acts of prostitution following the shooting of Broderick were far more prejudicial than probative and constituted reversible error.
*254 Based on the foregoing, we hereby reverse Margie Diann Lockett's conviction of murder and remand this cause to the Circuit Court of Jackson County for proceedings consistent with this opinion.
REVERSED AND REMANDED.
ROY NOBLE LEE, P.J., and BOWLING, HAWKINS, PRATHER, ROBERTSON and SULLIVAN, JJ., concur.
PATTERSON, C.J., not participating.
WALKER, P.J., dissents.
NOTES
[1] 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).