LEIGH M. CLARK, Retired Circuit Judge.
This is an appeal from judgments of conviction and sentence following a jury trial in which defendant-appellant was found guilty of burglary in the first degree, rape in the first degree, and sodomy in the first degree, for which he was sentenced to imprisonment for life as to the convictions for burglary and sodomy, to run concurrently with each other, and 150 years for the conviction of rape in the first degree, with such sentence to run consecutively to the sentence in the other two cases. This case had previously been before this Court, on appeal from judgments of conviction and sentence for first degree burglary and first degree rape; those judgments were based on defendant’s plea of guilty pursuant to plea bargaining agreement made with the understanding that the charge of sodomy would be nol-prossed. The judgments of conviction and sentence were reversed, Smith v. State, 494 So.2d 182 (Ala.Cr.App.1986).
As the brief of counsel for appellee in the instant case adopts the statement of the case and the statement of the facts as found in brief of counsel for appellant, we quote from the brief of counsel for appellant the following, in which we omit the name and identity of the female victim so as to preclude unnecessary embarrassment to her (in the quotation hereinafter made we will refer to her merely as the victim):
“This case concerns the alleged rape and sodomy, resulting from the burglary at the place of the alleged victim. She testified that in the early morning hours of September 14, 1985, ... a man’s head *8 peeked around the bedroom door wearing a mask. The man closed the door behind him and approached the victim with a knife in his hand. The man was dressed in his underwear with a mask on his head. The man put his hand on the victim’s mouth and told her not to scream.
“The victim described the mask the man was wearing as a ski mask with the eyes, nose and mouth cut out, and described the knife as a small kitchen knife. She then testified that the assailant pulled her down on the bed, removed her panties and began to have sex with her. The assailant never removed the hood from his face. The assailant had sex with the victim in several different positions. During this, the assailant and the victim spoke. The victim testified there were more than four different acts of sex of sexual intercourse, including oral sex. The victim testified in each sexual act there was penetration.
“The victim then testified that while the knife was usually in his hand during this period of time, he had at one time laid the knife on the bed and at one time placed the knife in her hands. At the time he brought the knife up to his chest and pulled her hand over the knife in the center and said, ‘You’ve got the knife, go ahead and kill me.’ The victim testified that ‘she couldn’t kill him.’ She stated that she did not use the knife on him because she was afraid.
“During the attack, the victim stated that she recognized the assailant’s voice and she could recognize his eyes because he had real heavy eyebrows and his mouth and the way he was built. She stated that all she knew at the time was that she believed the attacker to be ‘James’, a boyfriend of an acquaintance of hers that lived nearby. The victim stated that she had an opportunity to hear the voice of James more than 25 times prior to the attack. The victim testified the attack took place over a period of time greater than an hour. “Following the attack, the victim called a police officer friend of hers, who reported the incident to the police. Investigator Renee Grimsley of the Montgomery Police Department arrived on the scene in response to this call. A short time later, the victim described to Officer Grimsley the attacker as a ‘James’ who lived in a house up the street with a girl friend. The victim did not know the last name of the person known as ‘James’. Then Officer Hurst completed the incident or offense report. In this report, Hurst described the assailant as a black man in his twenties, with a height of 5'6" tall and weight of 130 pounds. It provided no name, not even ‘James’. It contained no response for address or probable destination of the assailant. Under the portion of the offense report requesting information with the questions ‘can a suspect be named?’ the box marked ‘No or Unknown’ was completed. Several days after the complaint, Investigators Grimsley and Faulkner began their investigation. On September 18, 1985, the officers approached an unknown subject raking grass or leaves and requested information as to whether he knew where a subject by the name of ‘James’ that lived with_could be located. This subject told the officer that such a person was at Doby Motel on the Mobile Highway. The officers proceeded to this motel to contact this ‘James’. At the motel, they found James Smith. They indicated they wanted to talk to him regarding the alleged incident involving the victim. The officers transported Smith to the Montgomery Police Department in a police car. Officer Grimsley then advised Smith of certain ‘rights’ and had Smith sign a ‘rights form’. Smith indicated a willingness to answer questions at that time and denied any involvement with the incident. The officers then began to collect evidence from Mr. Smith including hair and saliva samples, as well as a blood sample. The officers then contacted the victim to come to the police headquarters for a voice lineup which Smith was to participate in. Smith participated in this lineup and the victim identified Smith's voice as that of the assailant. The officers then approached *9 Smith and confronted him with the results of the voice lineup; ...
As a result of the voice lineup, the officers placed Smith under arrest with the charges of rape, burglary and sodomy. Officer Grimsley testified that up until the time following the voice lineup, Smith would have been free to go had he requested. These are the facts of the case upon which Smith appeals his conviction on a charge of burglary, rape and sodomy.”
We now quote from the testimony of Officer Margaret Faulkner, a witness for the State:
“Q. Did you have an occasion to be called to a response of some form of assault alleged to have occurred on Hatton Avenue?
“A. Not on the 14th I wasn’t. I did not get involved until the 18th.
“Q. Are you the partner of — were you at that time the partner of Officer Grimsley?
“A. Yes, I was.
“Q. And did you do anything with the case between the 14th and the 18th?
“A. No, I did not.
[[Image here]]
“Q. What was your involvement on the 18th?
“A. We had talked with the victim and went back and canvassed the area of the assault, the apartment area where she lived in out there.
[[Image here]]
“Q. Who did you speak to over there? Did you speak to anybody in particular?
“A. We spoke to the victim, and we spoke to a gúy named — he was raking leaves. Wait a second and I will give you his name. A black male named Rene that was raking leaves out there at the apartment complex.
[[Image here]]
“Q. Did you have an occasion later on the 18th to approach Mr. Smith who is seated right here? (Pointing to defendant).
“A. Yes, sir. I know him.
“Q. Where did you first meet Mr. Smith?
“A. At Doby’s Motel.
[[Image here]]
“Q. Did you suspect him or anything at that point?
“A. Yes, sir. He was a suspect.
“Q. Did you inform him that he was a suspect?
“A. Yes, sir.
“Q. And where did you take Mr. Smith? “A. To Police headquarters.
“Q. What did you do with Mr. Smith there?
“A. We read him his rights.
[[Image here]]
“A. We informed him that we needed to talk with him in reference to a complaint of sexual assault and burglary that happened at his apartment complex, and that his name had come up in the investigation. That’s exactly what we informed him.
“Q. And what did he say?
“A. He said he didn’t know anything about it, but he would be glad to come down to headquarters and talk with us. We asked him if he would.
“Q. So when you went down to headquarters, did you ask him — again, this is prior to any tests or specimens being taken from him. Did you ask him again if he knew anything about after reading his rights?
“A. Yes, sir.
“Q. And what was his response then?
“A. He didn’t know anything about it.
“Q. Now, did you participate in forming a voice identification lineup?
“A. Yes, sir, I did.
“Q. What was your participation in that?
“A. I was with [the alleged victim],
“Q. Did you assist her in picking the persons that participated in this lineup?
“A. Who, Rene Grimsley [another police officer]?
“Q. Yes. I’m sorry.
“A. Yes, I did.
*10 “Q. Were you in the room while the voice identification lineup was taking place?
“A. Yes, I was.
“Q. Were you there immediately after the voice identification lineup?
“A. What do you mean?
“Q. Well, after [the alleged victim] had identified somebody, were you in the room at that time?
“A. Yes, I was.
“Q. Tell me how the voice identification lineup was conducted?
“A. We had [the alleged victim] in Sgt. Ingram’s office, there’s a door adjoining Lt. — I mean, it’s Lt. Ingram’s office. And there is a door that adjoins the two offices that goes from one office to Lt. Gant’s office. [The alleged victim] was in Lt. Ingram’s office sitting in a chair. We opened the door. We let each black male come in and read three sentences.
“Q. Are those the three black males that you believed participated in that voice lineup?
(referring to photographs).
“A. Yes, sir.
“Q. Did you tell the statements to each of the persons and then they repeated them back to you?
“A. The words? The sentences? Yes— no. We gave them a piece of paper that had what we wanted them to read back on them.
“Q. To all of the people?
“A. As they came in, one at a time.
“Q. So each of them read from a paper. Nobody repeated what anybody had to say?
“A. They read. There were three sentences that [the alleged victim] wanted— that she said she remembered this guy saying. And we wrote those sentences down on a piece of paper and gave them to each black male as he entered the room and asked him to read those sentences.
“Q. So nobody said anything that you said, repeat after me? Nobody said anything like that?
“A. No. No, not that I recall.
“Q. I want you to do me a favor and let’s read statement number one there. Read it to me in about the same tone or the same volume that you would have had those persons say it.
“A. We just asked him to read it. We didn’t ask them to put any kind expression in it.
“Q. You observed it though?
“A. I heard it.
“Q. Can you tell me the type of volume that they used in reading it?
“A. Don’t do that. Don’t do that. Some was louder, some was softer, some was more verbal than others in it.
“Q. After that, did you tell Mr. Smith he had been identified in the voice lineup?
“A. I didn’t; Investigator Grimsley did that.
“Q. Were you there when she did that?
“A. Yes, sir.
“Q. Did you participate in taking a statement from Mr. Smith?
“A. I was in the room, but I did not do any of the questioning.
“Q. You were in the room during the taking of the statement?
“A. Yes, sir.
“Q. Did you help coach Mr. Smith at all?
“A. What do you mean by coaching?
“Q. If he had difficulty with an answer, did you maybe help provide him with an answer?
“A. No sir.
“Q. Did Officer Grimsley maybe help provide him with an answer to?
“A. I don’t know what you mean exactly by help providing. We asked questions and he answered.
“Q. Well, If he didn’t know something, did you kind of mouth something to him or help him with an answer?
“A. We might have explained our question, but as far as coaching him in an answer, no, we didn’t.
*11 “Q. Were you present when the typed statement was prepared?
“A. I was present when we got it back; yes.
“Q. Did you allow Mr. Smith to go over the typed statement?
“A. I don’t think I did. I don’t recall.
“Q. Did you allow Mr. Smith to read the typed statement and sign it?
“A. No, sir.”
The following are the issues raised on this appeal, which we will hereinafter consider in the order raised in brief of counsel for appellant:
I. WAS THE INVESTIGATORY PICKUP OF SMITH BY THE POLICE OFFICERS ON SEPTEMBER 18, 1985, AN UNLAWFUL ARREST AS IT WAS NOT SUPPORTED BY PROBABLE CAUSE? “11. DID THE TRIAL COURT COMMIT ERROR BY ADMITTING THE STATEMENT OF THE DEFENDANT INTO EVIDENCE?
“III. DID THE TRIAL COURT COMMIT REVERSIBLE ERROR BY REFUSING TO RECUSE ITSELF FROM THIS CASE?
“IV. WAS THE SENTENCE IMPOSED BY THE TRIAL COURT IN THIS CASE AN UNLAWFUL SENTENCE UNDER THE LAW, OR IN VIOLATION OF THE DEFENDANT’S CONSTITUTIONAL RIGHTS?”
I.
In the brief of counsel for appellant as to this issue, it is stated:
“Since such an arrest is illegal, it has been held that the confession obtained through a custodial interrogation following an illegal arrest should be excluded, unless intervening events break the causal connection between the arrest and the confession so the confession is sufficiently an act of free will to purge the primary taint. Taylor v. Alabama, 457 U.S. 687 [102 S.Ct. 2664, 73 L.Ed.2d 314] (1982).
“As a result of apparent information given by [the victim] that her assailant might be a man named ‘James’ who lived with a friend named_ (despite her signed statement on the date of the offense that no name for the assailant was known), Officers Grimsley and Faulkner proceeded to canvass the area in search of this person. The officers contacted an unnamed and apparently unknown person who referred them to Doby’s Motel to find a ‘James’ living with a_ There was no testimony or evidence presented at trial as to the identity or credibility of this source. The officers approached James Smith at Doby’s Motel and asked him to accompany them downtown for investigatory questioning. Officer Grimsley testified that Mr. Smith was free to go at any time during the period of interrogation prior to the voice lineup (R-190). For this interrogation, the Defendant was brought to a room in police headquarters, the door was often shut, and possibly locked, Mr. Smith was questioned regarding the incident throughout the period of time he was in this room, hair pullings were taken from Mr. Smith, saliva samples were taken as well as blood drawn from Mr. Smith. To the question asked of Officer Grimsley, ‘Why didn’t you just question him at Doby’s?’, she responded, ‘We don’t handle investigations that way. We take people back to our office to talk to them.’ As a result of this arrest, the police officers obtained a confession from Mr. Smith as well as samples for physical evidence and a voice lineup identification by the victim.
“The record is clear that the officers did not have probable cause to arrest Mr. Smith at that time. The officers’ information at that time was limited to a first name, no known street address, the first name of someone with whom he was alleged to have lived with, and information provided by an unknown source of unknown credibility. The information which led the officers to focus their attention on James Smith was provided not by the victim in this case, but rather by the individual raking leaves. Accordingly, at the time of the pickup of James Lewis Smith by Officers Grimsley and *12 Faulkner, they might have had reasonable suspicion to question briefly James Lewis Smith; however, they clearly did not have probable cause to arrest Mr. Smith. The elements of the Dunaway case apply to this case: Smith was taken from the scene in a police car, was placed in a room for interrogation, and was not told he was free to go. Therefore, the ‘investigatory’ taking into custody of Mr. Smith was an unreasonable seizure in violation of Smith’s constitutional rights as delineated in the Dunaway and Taylor decisions noted above.
“The taint of the illegal arrest was not purged by the circumstances of this case. In determining whether the confession has been purged of the taint of the illegal arrest, the factors to be considered include the temporaral proximity of arrest and the confession, the presence of intervening circumstances and, particularly, the purpose and flagrancy of official misconduct. Taylor v. Alabama, supra. In the Taylor case, the illegal arrest was not cured by the fact that six hours had elapsed between the arrest and the confession; in the case at bar more than 4 and ⅜ hours has elapsed. In the Taylor case, the illegality of the arrest was not cured by the fact that Miranda warnings were given before the confession; in the case at bar possible Miranda warnings were given only once, and even then several hours prior to the confession, thus no cure through those warnings. It can certainly be argued that the police contact was purposeful and a flagrant attempt to strengthen their case by gathering evidence from Mr. Smith prior to an arrest. The police officers knew fully well that following arrest, Smith might well be less inclined to cooperate with the officers. This conduct can be shown by the police officers’ refusal to permit Mr. Smith to review his confession after it had been typed. This denial prevent Mr. Smith from recanting this confession once the pressure of the moment had passed. Therefore, applying the factors listed, it is clear that the investigation conducted by the officers upon Mr. Smith was in fact a warrantless arrest unsupported by probable cause; accordingly, none of the decisions cited, the evidence obtained as a result of this action and which had not been cured of its taint should have been excluded. Therefore, it was an error for the trial court to admit this evidence; the conviction of the defendant should therefore be reversed and remanded with instructions to the trial court to grant the defendant a new trial and to exclude all evidence resulting from this illegal arrest.”
We do not agree with the position taken by counsel for appellant as stated above. Although the law enforcement officers succeeded in their effort to obtain confessions from the defendant as to the burglary, sodomy by force, and rape of the alleged victim by their conversations with the defendant, they had otherwise obtained sufficient evidence from the victim herself that justified their arrest of the defendant.
II.
For reasons stated under Issue I above, we determine that the trial court did not commit error by admitting the statement of the defendant into evidence, as contended by Issue II raised by appellant’s attorney.
III.
Although counsel for appellant makes a strong argument in his brief in favor of the issue that the trial judge committed reversible error in refusing to re-cuse himself from the trial of the case now on appeal, he fails to cite any authority which supports appellant’s position as to this issue and we are not convinced that the issue should be decided favorably to appellant.
IV.
We do not agree with all of the contentions of counsel for appellant as to this issue, but we are of the opinion that he is correct as to the contention made in his brief as follows:
“The sentence of 150 years on a charge of Rape I is in violation of the Code of *13 Alabama, 1975. Smith was sentenced to 150 years on his conviction of rape in the first degree. The Code of Alabama 1975, § 13A-5-6(a)(1) states that the term of imprisonment for a Class A felony is limited to a time of life or not more than 99 years nor less than 10 years. Further, § 13A-5-6(a)(4) provides that for a Class A felony in which a deadly weapon was used the term of imprisonment is to be not less than twenty years. This Section was invoked by the State at the time of sentencing. The decision of Smith v. State, 447 So.2d 1327 (Ala.Cr.App.1983), affirmed, 447 So.2d 1334 (Ala.1984), states the Code Section is to be construed as a whole and therefore it is clear that the maximum times are in fact supplied by subsection (a)(1), described above; accordingly, the maximum term for sentencing pursuant to § 13A-5-6 for a Class A felony where a deadly weapon is used is for life or not more than 99 years. Therefore, the sentence of 150 years was unlawful.”
It is our opinion that the judgments of conviction should be affirmed, but that the judgment of sentence to imprisonment for 150 years is not correct and that the case should be remanded for proper sentencing on the rape charge. Adequate notice should be given to the parties of the time and place of the sentencing hearing, and the trial court will make return to this order of remand with notice thereof to the parties; either party aggrieved thereby will have the right within fourteen days to file a brief in support of the position taken by said party and the opposing party will have seven days thereafter in which to file a reply brief.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of this Court.
CONVICTIONS AFFIRMED; SENTENCES FOR BURGLARY AND SODOMY AFFIRMED; REMANDED FOR RE-SENTENCING ON THE RAPE CONVICTION.
All Judges concur.